Berenice Thoreau de la Salle, In Pro Per
Post Office Box 9399
Mammoth Lakes, CA 93546
Phone: (760) 937-5645
Fax:    (760) 934 9584
Email: delasalleberen@aol.com



FILED

NUV 18 2009

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
           DEPUTY CLERK

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF CALIFORNIA AT SACRAMENTO

| | |
|---|---|
| BERENICE  THOREAU DE LA SALLE,　)<br><br>Plaintiff,　)<br>　)<br>　)<br>　)<br>v.　)<br>　)<br>AMERICA'S WHOLESALE LENDER;　)<br>MORTGAGE ELECTRONIC　)<br>REGISTRATION SYSTEMS, INC.;　)<br>RECONTRUST COMPANY, N.A.;　)<br>BAC HOME LOANS SERVICING, LP;　)<br>JOHN OR JANE DOES 1 though 100　)<br>　)<br>Defendants.　)<br>_____)   | Case No.: **2:09cv2710 MCE KJM**<br><br>**FIRST AMENDED COMPLAINT<br>FOR DECLARATORY RELIEF<br>INJUNCTIVE RELIEF,<br>AND DAMAGES**<br><br>COUNTS:<br>1. Recoupment<br>2. 15 USC 1692<br>3. 28 USC 2201<br>4. U.S. Const., Amend 5 & 14<br>5. Violation of  FFCRA<br>6. Fraud<br>7. Violation of RESPA<br>8. Cal. Civil Code 2923.5<br>9. Cal. Civil Code 2923.6<br>10. Cal. B&P 17200<br>11. Breach of Implied Covenant<br>　　Good Faith and Fair Dealing |

## JURY TRIAL DEMANDED

### I
### JURISDICTION

1.      The jurisdiction of this Court is pursuant to 28 U.S.C. 1331 (federal question), 15 U.S.C.

1692k(d)(fair debt collection practices act) and 28 USC 1367 (pendent state claims).

## II
## VENUE

2.    Venue is pursuant to 28 U.S.C. 1391(b), (c) and e(2).  Venue lies in the Eastern District of California as Plaintiff's claims arose from acts of the Defendants perpetrated therein and the property in question exists within this district and the County of Mono, State of California.

## III
## PARTIES

3.    Plaintiff Berenice Thoreau de la Salle is an individual natural person, currently residing within Mono County, State of California.  She is a "consumer" as that term is defined by 15 USC 1692a(3).  Plaintiff requests attorney fees herein not for herself, but for counsel whom she may retain in this action.

4.    On information and belief, Countrywide Home Loans, Inc., a California corporation, was doing business as "America's Wholesale Lender."  Defendant America's Wholesale Lender is (i) the originator of the loan in question and (ii) asserts that it has the equitable right to collect payments on the Promissory Note reportedly in default pursuant to some type of contract, arrangement or scheme. Defendant America's Wholesale Lender is a "creditor" as that term is defined by 15 USC 1692a(4).

5.    On information and belief, Defendant Mortgage Electronic Registration Systems, Inc., ("MERS") is a Delaware corporation with its principal place of business in the State of Michigan.  Defendant MERS is the alleged legal title owner/beneficiary of the Deed of Trust (Security Instrument "Mortgage"). Defendant MERS is a "debt collector" as that term is defined by 15 USC 1692a(6).

6.    On information and belief, Defendant ReconTrust Company, N.A. is headquartered in Thousand Oaks, CA, and is a wholly-owned subsidiary of Bank of America, N.A.   ReconTrust

Company, N.A. is allegedly the trustee of the trust which is carrying out the foreclosure process pursuant to California Civil Code § 2924, et seq.  Defendant ReconTrust Company, N.A. is a "debt collector" as that term is defined by 15 USC 1692a(6).

7.     On information and belief, BAC Home Loans Servicing, LP, is a corporation doing business in the State of California.  Defendant BAC Home Loans Servicing, LP, is the servicer of the subject mortgage loan.  BAC Home Loans Servicing, LP, previously known as Countrywide Home Loans Servicing, LP, is a subsidiary of Bank of America, N.A.  Defendant BAC Home Loans Servicing, LP is a "debt collector" as that term is defined by 15 USC 1692a(6). (Note:  "Defendants" refers to all named defendants.)

8.     Plaintiff is unaware of the true names and capacities of the Defendants sued as John or Jane Does 1 through 100 inclusive and, therefore, sues these Defendants as Does.  Plaintiff is informed and believes that each of these Doe Defendants is in some manner responsible for the acts alleged in this Complaint and for the damages suffered by Plaintiff as described within this Complaint.  Plaintiff will seek leave to amend this Complaint when the true names and capacities of these Doe Defendants are ascertained.

9.     Plaintiff is informed and believes that some of the Defendants are the agents, servants and/or employees of the remaining Defendants, and in doing the things described within this Complaint were acting within the scope of their agency and/or employment.

10.    Plaintiff is the legal owner of a single family residence, located at 1687 Forest Trail, Mammoth Lakes, CA  93546.  The legal description of said property is: Lot 111, of Mammoth Slopes unit No. 3, in the town of Mammoth Lakes, County of Mono, State of California, as per map recorded in book 5, pages 85 through 85-E of maps, in the office of the County Recorder of Mono County. Assessor Parcel Number:  31-120-23.

//

## IV

## GENERAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

11.     On or about April 28, 2005, Plaintiff executed a Promissory Note. (Exhibit 1)
Concurrent with the execution of the Promissory Note, Plaintiff also executed a Deed of Trust
("mortgage loan") which purported to secure the payment of the Promissory Note with the
subject real estate. (Exhibit 2)  Plaintiff incurred this financial obligation for personal, family or
household purposes, and this obligation is a "debt" as that term is defined by 15 USC 1692a(5).
A Promissory Note is a negotiable instrument as defined by the Uniform Commercial Code. A
Deed of Trust, when joined to a Promissory Note, is the Security Instrument securing payment of
the Note.  The term "mortgage loan" herein refers to Plaintiff's Promissory Note and the Security
Instrument together, as so described by the Deed of Trust. (Exhibit 2, page 2, para's. (F) and (H);
page 12, para. 20)

12.     The face amount of the Promissory Note and Deed of Trust indicates $668,000.00 is to be
paid to Lender, Defendant America's Wholesale Lender. The mortgage loan is a federally related
mortgage and the funds were made available through a federally insured depository institution.

13.     The Deed of Trust conforms to Fannie Mae/Freddie Mac requirements for a Uniform
Instrument so that it may readily be sold in the secondary and tertiary markets. (Exhibit 2,
bottom of document)

### MERS is not a Real Party in Interest to the Mortgage Loan

14.     The Promissory Note does not reference Defendant MERS in any manner, and provides
solely that payment is to be made to Lender. (Exhibit 1)  However, the Deed of Trust states that
MERS ". . . is a separate corporation that is acting solely as a nominee for Lender and Lender's
successors and assigns. MERS is named as the beneficiary under the Security Instrument. . . .".

(Exhibit 2, page 2, para. (E))

15.     The statement in the Deed of Trust that Defendant MERS is a beneficiary under the Deed of Trust is a false representation and a sham.    Defendant MERS never had a right to enforce the Promissory Note because neither Defendant MERS or its agents or principals had ownership or possession of the Promissory Note, and as such, they never were entitled to receive any payment due under the Promissory Note. Defendant MERS has publicly admitted on its website that it is the mortgage alone that gives it the right to foreclose, and that it is not the beneficial owner of the Promissory Note. Rather, that owner is typically an investor who purchases the debt in the secondary market. (Exhibit 3)  Defendant MERS  is a bankruptcy-remote subsidiary of MERSCORP, Inc., whose sole purpose is to serve as the *purported*  mortgagee in the land records for loans registered by MERS members on the MERS® System (a national computer networked database which  purports to electronically track ownership and servicing rights of mortgages that have been "securitized.")  [MERSCORP, Inc, is in turn owned and controlled by 28 leading mortgage industry companies.] When closing on a home mortgage, participating members of the MERS® System list MERS as the "mortgagee of record" on the paper mortgage. The mortgage is then recorded with the county property recorder's office under MERS' name, rather than the lender's name—even though MERS does not solicit, fund, service, or ever actually own the loan. MERS then purports to remain the mortgagee of record for the duration of the loan, even after the originating lender, or a subsequent assignee, transfers the loan into a "Special Purpose Vehicle" (SPV) for "securitization." (A complete explanation of the Securitization Process is given in paragraphs 21 and 24) MERS justifies its role by explaining that it is acting as a "nominee" for the parties and that, as a "nominee," it has standing to foreclose even though it is not, nor has ever been, a real party in interest to the mortgage loan, nor an agent for the real parties in interest.

16.     Over the past two years, numerous courts across the country have ruled that MERS is not a holder in due course nor a real party in interest to the mortgage loan and that its "nominee"

status does not give it standing to foreclose in either a judicial or a non-judicial foreclosure proceeding. Some of these rulings go so far as to suggest that MERS' attempts to argue otherwise are a fraud upon the court. [*In e.g., see the rulings in:* Landmark National Bank v. Kesler, No. 98,489 (Kan. 8/28/2009) (Kan., 2009); Bellistri v. Ocwen Loan Servicing, LLC, 284 S.W.3d 619 (Mo. App., 2009); Saxon Mortgage Services, Inc. v. Hillery, 2008 WL 5170180 (N.D. Cal. 2008) (unpublished opinion); In re Vargas, 396 B.R. 511 (Bankr.C.D.Cal., 2008); In re Hwang, Case No.: LA08-15337SB (Bankr.C.D.Cal. 9/24/2008) (Bankr.C.D.Cal., 2008), amended opinion at In re Kang Jin Hwang, 396 B.R. 757 (Bankr.C.D.Cal., 2008)] Defendant MERS fraudulently intended to have Plaintiff believe that it was as much a party to the mortgage loan as she was a party to the loan because prior to execution of the Deed of Trust, it had already agreed to be the alleged mortgagee, as referenced by its name in the type print in the Security Instrument.

## The Promissory Note was Never Joined to the Deed of Trust; The Deed of Trust is a Nullity

17.    As stated, *supra,* a mortgage loan consists of a promissory note and a security instrument, typically a mortgage or a deed of trust. When the note is split from the deed of trust or, as in the instant case, when the note is never joined to the deed of trust, "the note becomes, as a practical matter, unsecured." RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) § 5.4 (1997). A person holding only a note lacks the power to foreclose because it lacks the security, and a person holding only a deed of trust suffers no default because only the holder of the note is entitled to payment on it. *See* RESTATEMENT(THIRD) OF PROPERTY (MORTGAGES) § 5.4 cmt. e (1997). "Where the mortgagee has 'transferred' only the mortgage, the transaction is a nullity and his 'assignee,' having received no interest in the underlying debt or obligation, has a worthless piece of paper." 4 RICHARD R. POWELL, POWELL ON REAL PROPERTY, § 37.27[2] (2000).

//

18.     The lender, Defendant America's Wholesale Lender, sold Plaintiff's Promissory Note into the secondary or tertiary mortgage market. The sale of the Promissory Note was not pursuant to the express terms of the Deed of Trust, which provides that "The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower." (Exhibit 2, page 12, para. 20)  The sale of the Promissory Note was not accompanied by the Security Instrument as required by the Deed of Trust. The Security Instrument remained in the name of MERS. The person or entity now holding only the Note lacks the power to foreclose because it lacks the security; and MERS, holding only the deed of trust, is not entitled to payment on it because it is not a Real Party in Interest to the Note.

19.     MERS is nothing more than a Third Party Debt Collector who, through the non-judicial foreclosure process and by hiding the identity of the true lender from the debtor, aids and abets its membership of "Pretender Lenders" in the illegal confiscation of properties in which said "lenders":

      (i)      have no pecuniary interest,

      (ii)     are not the holders in due course of the notes secured by the properties,

      (iii)    are not the Real Parties in Interest to the foreclosure process, and

      (iv)    are not the agents of the Real Parties in Interest.

**The Mortgage Banking System's Abuse of the Securitization Process**

**of Residential Real Estate Loans is Responsible for**

**the Current Real Estate Depression and Foreclosure Crisis**

20.     The "secondary mortgage market" consists of the government or one of the government-sponsored entities created by statute to purchase residential mortgage loans from banks and other lenders. See 12 U.S.C. §§ 1451-59, 1716-23 et seq. [creating the Government National Mortgage Association ("Ginnie Mae"), Federal National Mortgage Association ("Fannie Mae"), and Federal Home Loan Mortgage Corporation ("Freddie Mac")]. The "tertiary mortgage market"

consists of private entities, other than those made up by the secondary mortgage market, that purchase mortgage loans. There is a statutory purpose to the creation of the secondary mortgage markets, which is to enable the original lender to be able, from the sale of the first mortgage loan, to have additional funds readily accessible to additional home buyers. (12 U.S.C. §§ 1451, 1716)

21.     Over the past decade there has been an industry-wide practice of predatory lending and abuse of the secondary and tertiary mortgage markets through the "securitization" of residential real estate mortgage loans. [Much of the material in this paragraph, as well as in paragraphs 24 & 34, has been taken from testimony given on April 17th, 2007, by Professor Christopher L. Peterson at a hearing before the U.S. Senate Committee on Banking, Housing, and Urban Affairs Subcommittee on Securities, Insurance, and Investment: *Subprime Mortgage Market Turmoil: Examining the Role of Securitization,* by Christopher L. Peterson Associate Professor of Law, University of Florida]  Securitization is generally thought to have begun in 1977 when Bank of America and Salomon Brothers (with some assistance from Freddie Mac) first created a trust which pooled mortgage loans into trusts, and then passed through income from those loans to investors that acquired interests in the trusts in the form of securities. These securitized instruments, or conduits, are referred to as REMICs (Real Estate Mortgage Investment Conduits).

22.     During the 1980s and early 1990s, this market experienced the same explosive growth seen in the stock market of the 1920's, and for the same reason: in their quest for profit,  just as the bankers overleveraged the stock market throughout the decade of the twenties, over the past decade they overleveraged the entire US housing market by (i) originating mortgages with Loan to Value ratios as high as 90%, and then (ii) packaging the derivative income streams of these loans into bundles of securities which were sold to the public as REMICs.  It is widely recognized that the Great Depression occurred as a result of the banking industry's policy during the 1920s of overleveraging stock purchases.  A price bubble ensued on Wall Street as a result of

low margin requirements which allowed speculators to purchase a dollar's worth of stock for as little as 10 cents.   The market rose spectacularly and then crashed, causing the prices for goods, services, and land to plummet while creating massive unemployment. (*Only Yesterday, An Informal History of the 1920's,* by Frederic Lewis Allen, Chapters 11: *The Big Bull Market,* 12: *Crash!* & 13: *Aftermath: 1930 – 1931,* Harper & Row, New York, (1931) )   Similarly, over the past decade, by leveraging limited access to capital into many loans, "securitization" created a price bubble in real estate values while allowing loan originators and brokers (with no risk to themselves) to make great profits from the origination fees.  As the brokers and originators were paid out of the closing costs and the proceeds of selling loans to secondary market participants, the more loans "originated" the more money the broker or originator made.  By quickly assigning these loans into a securitization conduit, and using the proceeds of the sale to "churn" new rounds of loans, the bankers created the same bubble in real estate prices as seen in the stock market prices of 1929—with the same consequences: a crash in real estate values accompanied by high unemployment.

23.     Approximately 76.3% to 80.5% of all subprime mortgages originated in 2005 and 2006 were securitized.  *See* James R. Barth, et. al., A short History of the Subprime Mortgage Market Meltdown 5, fig. 2 (Milken Institute 2008) available at: http://www.milkeninstitute.org/publications/publications.taf?function=detail&ID=388010388&cat=Papers. Plaintiff's mortgage loan was "securitized."

### The Securitization Process, Summarized

24.     While there is tremendous variety in the way mortgage loans are securitized, Exhibits 11(a) and 11(b) provide simplified graphic depictions which summarize the flow of capital and information in a typical home mortgage loan that has been securitized. In this process, the loan Originator who first initiates contact with a potential borrower either has access to a warehouse line of credit to fund the loan or has already presold it to the Seller of the securities that will

1  eventually be held in Trust for the benefit of the *true owners* of the loan. The net effect of this
2  process is twofold: (1) the "lender," while named as the beneficiary in the promissory note, has
3  not put a single cent of its own money into the property serving as the underlying collateral for
4  the instrument executed by the borrower, and (2) the Deed of Trust, as a result of the
5  securitization process, is never joined to the Note, thus the Note loses its security and itself
6  becomes non-negotiable. The Originator (in the instant complaint, America's Wholesale Lender,
7  aka Countrywide Home Loans, Inc.) establishes its right to payment by giving public notice of
8  the mortgage through recording it with a county recorder's office. Then, in a typical conduit, the
9  Originator will quickly transfer the loan to a subsidiary of an investment banking firm. The
10  subsidiary of the investment banking firm, alternatively referred to as the securitization Sponsor
11  (or Seller), then transfers the loan and hundreds of others like it into a pool of loans, called an
12  SPV (Special Purpose Vehicle). [Sometimes the loans will be held in a SPV that is a wholly-
13  owned subsidiary of the Originator or the underwriter while awaiting assignment into an
14  independent SPV that will issue securities. (See, e.g., Steven L. Schwarcz, *The Alchemy of Asset*
15  *Securitization*, 1 STAN. J.L. BUS. & FIN. 133, 142 (1994) (describing advantages of "two tier"
16  securitization conduit structures)]  This SPV (pool of loans) will become its own business entity.
17  The SPV can be a corporation, partnership, or limited liability company, but most often is a
18  Trust. [The SPV has no other assets, employees, or function beyond the act of owning the
19  loans.] Under the agreement which transfers the loans into the pool (Pooling and Servicing
20  Agreement or PSA), the SPV  then sells to investors pieces of itself  known as "tranches" (from
21  the French word *trancher*, meaning "to slice"). In a typical transaction, the investment banking
22  underwriter purchases all the "securities" issued by the pool. These securities are, in effect, the
23  derivative income streams drawn from payments on the underlying mortgages. Usually
24  employing one or more placement agents who work on commission, the underwriter then sells
25  the securities (in the form of certificates) to hedge fund managers and other investors. The
26  certificates provide terms of payment of principal and interest to the investors: the certificate
27  holders.
28  //

25.     As Defendant MERS publicly asserts, the "investors" are the beneficial owners of the mortgage loan. (Exhibit 3, fn 1)

**MERS is the mortgage industry's effort to create a single, national foreclosure plaintiff that always has foreclosure standing, but never has foreclosure accountability.**

26.     When the note is sold by the original lender to others, as stated supra, the sale is tracked on the MERS® System: a private, for profit, database and tax evasion service causing atrophy in the nation's public real property information infrastructure by (i) destroying the transparency in ownership of real property heretofore safeguarded by county recording offices, and (ii) usurping the recording fees that once funded maintenance, innovation and vigilance in public record keeping systems.  Currently, more than half of all home mortgage loans originated in the United States are registered on the MERS system. (R.K. Arnold, Viewpoint, INSIDE MERS (MERS Inc.), May-June 2004, at 1.)  MERS has member entities who typically are purchasers in the tertiary mortgage market.  If the mortgage loan is sold to a non-member of MERS, an assignment from MERS to the non MERS entity is made, executed and recorded in the county where the real estate is located, and the loan is "de-activated" from the MERS® System.  MERS is actively working to insure that, one day, de-activation from the MERS® System will cease entirely.  The Chief Executive Officer of MERS, R.K. Arnold, has stated publically that it is the mission of MERS "to capture every mortgage loan in the country." (*MERS Registers 20 Million Loans, INSIDE MERS*, Jan/Feb. 2004, at 1.)  MERS' mission is to (i) supplant the public land title recording systems' lien records with a purely private system, (ii) impose upon the judicial system a "new standard of practice" by the Mortgage and Banking Industry with regard to the recordation and subsequent assignments of negotiable instruments, and, (iii) achieve these ends in the absence of legislation or meaningful judicial precedent thereby thwarting more than 200 years of codified mortgage law.

//

//

27.     The MERS recording and foreclosure system has been a contributing cause of the American mortgage foreclosure crisis, as is explained by Christopher L. Peterson, the Associate Dean of Academic Affairs and Professor of Law at the University of Utah, S.J. Quinney College of Law, in his legal abstract entitled FORECLOSURE, SUBPRIME MORTGAGE LENDING, AND THE MORTGAGE ELECTRONIC REGISTRATION SYSTEM. (E-copy available at http://ssrn.com/abstract=1469749) MERS facilitates predatory structured finance by decreasing the "exit costs" of loan originators. During the years 2000-2007, as investment banks, hedge funds, institutional investors, and the credit rating agencies weighed the risks of dumping billions of dollars into mortgage securities drawn out of the balance sheets of thinly capitalized, bankruptcy prone mortgage lenders, MERS provided an inducement to take that risk. When thinly capitalized loan originators churned out more and more securitized loans, the claims against those lenders accumulated while their assets did not.  Once the projected costs of (i) the recourse demands by the disgruntled investors and (ii) the borrower predatory lending lawsuits, had exceeded the projected costs of bankruptcy and reformation under a new corporate guise, management of the loan originators would predictably opt to discard their corporate identity. (Christopher L.Peterson, *Predatory Structured Finance*, 28 CARDOZO L. REV. (2007) at 2275) MERS made this easier by offering a *super-generic placeholder* that transcended the aborted life of the loan originators. MERS reassured investors that even when an originator goes bankrupt, county property records would remain unaffected and foreclosure could proceed apace. By serving as the true mortgagee's proxy in recording and foreclosure, MERS abetted a pump-and-dump, no accountability model of structured mortgage finance.  Moreover, the use of MERS' corporate identity has facilitated the separation of foreclosure actions and litigation of predatory lending and servicing claims. When MERS (or, more accurately, servicers or foreclosure specialists acting in MERS' name) brings foreclosure actions, it justifies this entitlement based on a fraudulent claim of legal ownership of mortgage liens. But, when borrowers attempt to assert counter-claims challenging the legality of mortgage brokers, lenders, trusts, or servicers, MERS hides behind its claims of "nominee" status.  MERS represents the mortgage finance

//

industry's best effort to create a single, national foreclosure plaintiff that always has foreclosure standing, but never has foreclosure accountability.

**BAC Home Loans Servicing is Required to Modify Plaintiff's Loan according to HAMP**

28.     On or about January 5th, 2009, Plaintiff placed a call to the Countrywide Home Retention Division to see how she could take part in a loan modification program. Plaintiff spoke to a woman named Arnetta who (i) stated several times that Plaintiff appeared to be eligible for the Home Retention Program and (ii) instructed Plaintiff to FAX proof of income to said Division. Plaintiff requested an address where she could also mail a modification proposal along with (i) proof of income, (ii) a break-down of her revenue and expenses, (iii) a hardship letter, explaining that she had fallen behind on her payments due to the severe illness of her husband and his need for Plaintiff's constant care, which care had interfered with her ability to work, (iv) a mortgage work-out plan, and (v) a market valuation of her property. The modification proposal was faxed, as requested, and mailed to the address given that same day. (Exhibit 4)   On January 20, 2009, Countrywide Home Loans sent a document to Plaintiff entitled "Notice of Intent to Accelerate." (Exhibit 5)  This document states that there are options available, such as a repayment plan and a loan modification.

29.     On January 27, 2009, Countrywide sent to Plaintiff a letter denying her requested loan modification for the following reason: "The modification does not meet defined criteria per the investor on the loan." (Exhibit 6)

30.     On information and belief, Countrywide Home Loans Servicing, LP, had executed a Servicer Participation Agreement with the United States Treasury Department for participation in the Home Affordable Modification Program ("HAMP"), and as such, was required to process Plaintiff's loan modification pursuant to the standards in that program. Those program standards were met by Plaintiff and she was and still is entitled to that federal benefit. Countrywide was

taken over by Bank of America, and Countrywide Home Loans Servicing, LP became Defendant BAC Home Loans Servicing, LP, which is still obligated under the HAMP program.

**ReconTrust is not an Impartial Third Party Trustee; ReconTrust is a Debt Collector**

31.     As stated, supra. Defendant ReconTrust Company N.A. is a wholly-owned subsidiary of Bank of America, N.A.  Subsequent to Plaintiff's receipt of the loan modification rejection letter from Countrywide, Plaintiff continued to make further requests for clarification as to the specific reason why her requested loan modification and repayment plan request was rejected. Additionally, she sent debt validation requests to all named Defendants.  On July 27, 2009, Defendant ReconTrust Company, N.A., sent to Plaintiff a "Debt Validation Notice" which states that Defendant ReconTrust Company, N.A. is acting as agent for the beneficiary and that it also may be a debt collector attempting to collect a debt. This letter states that the debt is $787,615.31.  This letter does not identify the true identity of the creditor to whom the debt is owed, as required by U.S.C. § 1692g(a). (Exhibit 7)  Plaintiff disputes the amount of the debt as overstated by nearly $100,000.00 and that the "beneficiary" is not entitled to any sum whatsoever from the Plaintiff because this debt is not owed to the beneficiary. Concurrent with receipt of the Debt Validation Notice, Plaintiff also received another document from Defendant ReconTrust Company, N.A., that being a "Notice of Default and Election to Sell Under Deed of Trust".  (Exhibit 8)  This document was also filed in the Recorder's Office in Mono County as document number 2009003802.

32.     On August 11, 2009, Plaintiff sent a letter to Defendant ReconTrust Company, N.A., again disputing the debt pursuant to the Federal Fair Debt Collection Practices Act and requested copies of the "papers that show I agreed to pay what you say I owe." (Exhibit 9)  Plaintiff requested these "papers" because she did not have a copy of the Note or Deed of Trust.

//

//

33.     On August 31, 2009, Wendy McKnight, vice-president of Defendant ReconTrust Company, N.A.'s legal support department, acknowledged Plaintiff's debt verification letter by sending her a letter that included a photocopy of the Promissory Note and Deed of Trust. (Exhibit 10)   The Promissory Note has previously been identified as Exhibit 1 to this Complaint and the Deed of Trust has previously been identified as Exhibit 2 to this Complaint.  The Promissory Note provided by Ms. McKnight does not contain an allonge, nor does it have any endorsements.  However, it does carry a mark indicating that it was certified as a true and correct copy.  That certification was made by an unidentified "escrow officer."  The photocopy of the Promissory Note is non-negotiable. Just as photocopies of Federal Reserve Notes (US Dollar Bills) are non-negotiable, a photocopy of a promissory note is nothing more than the counterfeit of the actual instrument. California Commercial Code § 3201 (a) and (b).  The Deed of Trust does not contain any assignment(s) of the Deed of Trust. Ms. McKnight's response did include a summary break-down of the debt, but it failed to include a payment history, including a break-down of each payment and how it was characterized and to whom it was paid.  Nothing in the response indicated in any way that the payments Plaintiff made on the mortgage loan were forwarded to the unknown "beneficiary."   Ms. McKnight also stated in her letter that if Plaintiff had any documentation indicating that the payoff calculation was incorrect, that Plaintiff was to direct those documents to Ms. McKnight.  Ms. McKnight and her principal, Defendant ReconTrust Company, N.A., were clearly not acting solely in the capacity of a trustee, but instead had taken on additional duties in the capacity of a debt collector agent of the unknown "beneficiary" of the Deed of Trust.

### The Debt Has Been Discharged

34.     In designing the Special Purpose Vehicle (SPV) and its investment tranches, the Seller (investment banking firm/underwriter) worked closely with a credit rating agency that rated the credit risk of each tranche. [The credit rating agency investigates the credit risk of the underlying mortgages as well as the risks posed from pooling the mortgages together. Credit ratings on each

tranche are essential, since investors rely on these ratings in deciding whether to invest in the pool of mortgages.]  Rating agencies typically require some form of credit enhancement on some of the tranches in order to assign them higher investment ratings. Often this enhancement takes the form of a Third Party guarantee from an insurance company to cover the potential losses from mortgage defaults.  These insurance policies are known in the financial markets as Credit Default Swaps (CDS):  swap contracts  [a derivative in which two counterparties exchange certain benefits of one party's financial instrument for those of the other party's financial instrument ; *see* http://en.wikipedia.org/wiki/Swap_(finance)] in which the buyer of the CDS makes a series of payments to the seller and, in exchange, receives a payoff of the mortgage amount if it goes into default. Credit Default Swaps may be purchased for speculative purposes, to bet against the solvency of a REMIC, (for example, in a gamble to make money if it fails) or to hedge against the risk taken by actually owning the REMIC securities.  If the mortgage goes into default, the proceeds from the CDS contract paid by the Third Party insurance company will effectively discharge the debt. [CDS contracts have been compared with insurance because the buyer pays a premium and, in return, receives a sum of money if one of the events specified in the contract occurs. The buyer of a CDS does not need to own the underlying security or other form of credit exposure; in fact the buyer does not even have to suffer a loss from the default event. The excessive selling of Credit Default Swaps is what destroyed the balance sheet of American International Group (AIG), exposing the insurance giant to losses over $180 Billion and requiring a federal bailout of the company.]

35.     Because there is no limit to the amount of swaps an investor, such as a hedge fund manager, can purchase to hedge the risk from defaulting loans held by an SPV, foreclosure of the underlying properties can actually lead to profits many times the amount of the actual loans.  On information and belief, this is one of the reasons why many Pooling and Servicing Agreements (PSAs) specifically prohibit the loan Servicer from  either (i) modifying the loans held by the SPV that are in risk of default, or (ii) allowing for the "Short Sale" of  properties that guarantee those loans. As profits from a  CDS cannot be reaped unless and until a "triggering event," such

as foreclosure, first occurs, by helping the borrower to *avoid* foreclosure, as mandated by

Congress through the Housing and Economic Recovery Act (HERA), the loan Servicer interferes

with the profits afforded the certificate holders (of REMICs) from their Credit Default Swaps.

36.   On information and belief:

    i.     MERS is not the beneficial owner of the Promissory Note;

    ii.    MERS is not the beneficial owner of the Security Instrument;

    iii.   The Promissory Note has been intentionally destroyed;

    iv.   The person/entity claiming to have the right to enforce the Promissory
         Note is not entitled to enforce it;

    v.    The person/entity claiming to have the right to enforce the Security
         Instrument is not entitled to enforce it;

    vi.   The Plaintiff's mortgage loan payments made to the Defendants were not
         transferred to the owner and holder of the Promissory Note;

    vii.   The chain of endorsements of the Note is broken and no Defendant has
         authority to enforce the Promissory Note;

    viii.  The chain of assignments of the Security Instrument is broken and
         no Defendant has authority to enforce the Security Instrument;

    ix.   There exists a Pooling and Service Agreement which controls the
         transfer of this particular Promissory Note and Security Instrument and it
         does not permit the Promissory Note and Security Instrument to have
         been transferred in the manner that Defendants and their agents or principals
         actually transferred it, and no Defendant therefore is entitled
         to enforce the Promissory Note and Security Instrument;

    x.    The mortgage note has been paid in whole or in part by one or more
         undisclosed third party(ies) who, prior to or contemporaneously with the
         closing on the mortgage loan, paid the originating lender in exchange for
         certain unrecorded rights to the revenues arising out of the loan documents;

    xi.   The mortgage note has been paid by one or more undisclosed third party(ies)
         who, having sold Credit Default Swaps to the Seller of the Special Purpose
         Vehicle (and/or its investor/certificate holders who actually own Plaintiff's
         Promissory Note), were required to pay off the entire amount of the Note at the
         time the Notice of Default was filed by Defendant ReconTrust Company, NA;

xii.  The Defendants, their agents and principals, have no financial
interest in the note or mortgage;

xiii. The revenue stream deriving from the Promissory Note and Security
Instrument were eviscerated upon one or more assignments of the
Promissory Note and Security Instrument to third parties and parsing of
obligations as part of the securitization process, some of whom were
joined as co-obligors and co-obligees in connection with the closing.

# V
# CAUSES OF ACTION

## COUNT 1
### Declaratory Judgment for Violation of Federal Truth in Lending –
### Removal of non-judicial foreclosure to Federal Court to defend based on recoupment
### 15 USC 1640(e)

37.   Plaintiff repeats and realleges Paragraphs 1 -36, inclusive, as if set forth in full herein.

38.   The subject mortgage loan was in material violation of the Federal Truth in Lending Act
for the following reasons:

    a.   It had an illusory 1% teaser rate;
    b.   It was a negative amortized loan though the disclosures did not reveal that;
    c.   The HUD, TIL Itemization Statement and other disclosures are materially
       divergent from the actual closing costs.

39.   The statutory period for rescission has passed.  There is no statutory period for defense by
recoupment in a non-judicial foreclosure proceeding.

40.   On or about July 29, 2009, Defendant Recontrust Company instituted non-judicial
foreclosure proceedings against the Plaintiff.  Those proceedings have not yet been completed
and a sale of the subject property has not yet occurred.

//

//

41.    Plaintiff is entitled by 15 USC 1640(e) to defend against the foreclosure in the nature of a "defense by recoupment." Non-judicial proceedings deny the Plaintiff an ability to exercise this federal right. Removal of the non-judicial foreclosure proceeding to federal court is necessary to ensure the Plaintiff is entitled to bring a federal defense by recoupment, otherwise the statute offers no remedy to the Plaintiff.

42.    WHEREFORE, Plaintiff prays for the following relief:

    a. Declaratory relief that she is entitled to remove the non-judicial foreclosure to federal court so that she may defend against said foreclosure pursuant to recoupment under 15 USC 1640(e).
    b. Declaratory relief as to recoupment.
    c. Costs.
    d. Attorney fees.

## COUNT 2
## VIOLATION OF FEDERAL FAIR DEBT COLLECTION PRACTICES ACT
## (15 USC 1692, et. Seq.)

43.    Plaintiff repeats and realleges Paragraphs 1 - 36, inclusive, as if set forth in full herein.

44.    Defendants, and each of them, were engaged in trade or commerce as defined by the act, specifically, in that they were attempting to collect a "debt" as defined in the act in that a mortgage payment is an obligation by the consumer to pay money arising out of a transaction in which the money, property, etc , are primarily for personal, family or household purposes.

45.    Defendants, and each of them, are debt collectors as defined in the act in that they are persons who use an instrumentality of interstate commerce or the mails in any business, the principal purpose of which is the collection of debts. In this particular matter, Defendants, and each of them, used the mail to attempt to collect a debt. Defendants, and each of them, their agents and principals, have no present ownership, right, title or possession to the subject

Promissory Note and the Security Instrument. As such, Defendants have attempted to collect and have collected upon a debt they have no standing to pursue.

46.     The actions described above by the Defendants, and each of them, violated the provisions of 15 USC 1692d in that while the Defendants were attempting to collect the alleged debt, the natural consequences were to harass, oppress and abuse the Plaintiff.

47.     The actions described above by the Defendants, and each of them, violated the provisions of 15 USC 1692e in that while the Defendants were attempting to collect the alleged debt, they did so by false and misleading statements of an entitlement to do so.

48.     The actions described above by the Defendants, and each of them, violated the provisions of 15 USC 1692f and 15 USC 1692f(6), in that while the Defendants were attempting to collect the alleged debt by threatening to take the Plaintiff's home and by actually beginning the process of taking the Plaintiff's home, the Defendants had utilized a non-judicial action to effect dispossession or disablement of the property which they had no lawful right to take.

49.     As a direct and proximate result of the actions of Defendants, and each of them, Plaintiff has been damaged in that (1) Plaintiff has made payments to an organization or entity that had no right or title to the payments; (2) Plaintiff faces the loss of her property; (3) Plaintiff has suffered actual damages in the form of humiliation, anger, anxiety, emotional distress, fear, frustration and embarrassment; (4) because Plaintiff is an individual, statutory damages in accordance with 15 USC 1692 et. seq. are appropriate.

50.     WHEREFORE, Plaintiff prays for the following relief:
        a. Actual damages;
        b. Statutory damages;
        c. Costs;
        d. Attorney fees.

## COUNT 3
## DECLARATORY RELIEF
## (28 USC 2201)

51.   Plaintiff repeats and realleges Paragraphs 1 - 36, inclusive, as if set forth in full herein.

52.   Pursuant to 28 USC 2201, et seq., a dispute has arisen between and among the parties to this action and the federally related mortgage loan, as to the duties and obligations of the respective parties with regard to the loan, loan payments, and non-judicial foreclosure.

53.   These disputes concern, but are not necessarily limited to, the ownership of the Promissory Note and Deed of Trust and the right to foreclose on same.

54.   As these questions concern Plaintiffs' home, Plaintiff therefore is required to seek this relief or lose her home to non-judicial foreclosure.

55.   Plaintiff further alleges that a declaration of rights and duties of the parties herein by the court is essential to determine the actual status and validity of the loan and any rights duties and/or obligations as to the enforcement of it.

56.   Plaintiff may be required to seek injunctive relief from this court to protect Plaintiff's rights and title to the property and to maintain the status quo from the threatened non- judicial foreclosure sale.

57.   WHEREFORE, Plaintiffs prays for the following relief:
   a.   Declaratory relief;
   b.   Restitution;
   c.   Any other and appropriate and necessary relief, including injunctive relief.

//

## COUNT 4
## VIOLATION OF U.S. CONSTITUTION, AMENDMENTS 5 AND 14
## (DUE PROCESS)

58.     Plaintiff repeats and realleges Paragraphs 1 - 36, inclusive, as if set forth in full herein.

59.     Defendants, and each of them, are federal actors, acting on behalf of a federal agency and pursuant to an activity that is solely governmental in nature.

60.     The mortgage loan is also subject to the federal Home Affordable Modification Act (HAMP) and enforcing regulations which arise under the Troubled Asset Relief Program or TARP.   This program is operated by the Federal Housing Finance Agency, which is the conservator for Fannie Mae and Freddie Mac, who oversee the program to ensure that the servicers, such as Defendant BAC Home Loan Servicers, LP, actually perform their federal obligations to the government and the homeowner.  The Act requires the Secretary to consent to any reasonable loan modification offer made by a qualifying individual. Plaintiff qualifies under the program and is entitled to the benefits thereof.  She has made repeated requests to partake of this program from all named Defendants and their predecessors in interest, but those requests have been ignored.  She has been denied benefits without explanation or a notice of her rights, including without a right to a hearing, in violation of 12 U.S.C. §§ 5211, 5213(3), 5219(a), 5219(c), 520(b) and 5225.

61.     On information and belief, the mortgage loan is also subject to federal pre-foreclosure default prevention procedures addressed in 12 USC 1710(a).   The Defendants, and each of them, have failed to avail Plaintiff of federal pre-foreclosure default prevention procedures. Compliance with the default loan servicing federal regulations promulgated by HUD, pursuant to the National Housing Act, 12 U.S.C. 1710(a) are a condition precedent to instituting a foreclosure action.  The Notice of Default and Election to Sell Under Deed of Trust is part of the process of a foreclosure action.  In particular, the Defendants, and each of them, (i) did not make

1  a reasonable effort as required by federal law to arrange a face to face meeting with Defendants

2  before three full monthly installments were unpaid, in violation of 24 C.F.R. 203.604;

3  (ii) did not evaluate all available loss mitigation techniques, and (iii) did not re-evaluate these

4  techniques each month after default, in violation of 24 C.F.R. 203.605.

6  62.     WHEREFORE, Plaintiff prays for the following relief:
            a.     Declaratory relief and injunctive relief requiring the Defendants to
7                  comply with the statutory and regulatory program;
            b.     Damages (Bivens);
8           c.     Costs; and,
9           d.     Attorney Fees (Bivens).

## COUNT 5
## VIOLATION OF FEDERAL FAIR CREDIT REPORTING ACT
### (15 U.S.C. §1681, et. Seq.)
### *Plaintiff v. BAC Home Loan Servicing, LP*

15  63.     Plaintiff repeats and realleges Paragraphs 1 - 36, inclusive, as if set forth in full herein.

17  64.     On September 22, 2009, Plaintiff pulled copies of her credit reports from the three major

18  credit reporting bureaus, TransUnion, Experian and Equifax (Credit Bureaus).  The credit reports

19  inaccurately reflected that Plaintiff owed Defendant BAC Home Loans Servicing, LP the sum of

20  $752,960.

22  65.     On September 25, 2009, Plaintiff sent, by way of certified mail, investigation requests to

23  the Credit Bureaus.  Said requests (i) informed the Credit Bureaus that their records were

24  inaccurate (ii) attached copies of the instant Complaint and (iii) demanded that all record of the

25  loan be removed from their files. [Exhibits 12 (a), (b) and (c)]

27  66.     On October 8, 2009, TransUnion responded to Plaintiff's investigation request by way of

28  a letter that stated: "Our investigation of the dispute you recently submitted is now complete.

1    The results are listed below."   TransUnion attached to the letter a Personal Information

2    Statement that carried a reference to the $752,960 loan as having been "verified" on 10/2009 and

3    "Disputed by Consumer." (Exhibit 13)

5    67.    Defendant BAC Home Loans Servicing, LP willfully and/or negligently continues to

6    wrongfully represent to the credit bureaus that Plaintiff owes it a sum for the subject mortgage

7    loan. Defendant BAC Home Loans Servicing, LP, does not hold or own the subject Promissory

8    Note and is therefore not entitled to make a negative reference on Plaintiff's credit report as if it

9    does own and hold said Promissory Note.

11   68.    Defendant BAC Home Loans Servicing, LP's, negative credit references on Plaintiff's

12   credit have caused Plaintiff damages from increased financing costs and diminished ability to

13   obtain financing.

15   69.    WHEREFORE, Plaintiff  prays for the following relief:

16        a.    Declaratory relief that Plaintiff does not owe Defendant BAC
                Home Loans Servicing, LP,  for said mortgage loan.
17        b.    Injunctive relief requiring Defendant BAC Home Loans Servicing, LP,
18              to eliminate the negative reference on Plaintiff's credit.
          c.    Actual and statutory damages.
19        d.    Costs; and,
20        e.    Attorney Fees.

## COUNT 6
## FRAUD
*Plaintiff v. America's Wholesale Lender, BAC Home Loan Servicing and Recontrust Company*

70.    Plaintiff repeats and realleges Paragraphs 1- 36, inclusive, as if set forth in full herein.

71.    At the time of the execution of the Deed of Trust on April 28, 2005, Defendant

28   ReconTrust Company was a wholly-owned subsidiary of Countrywide Bank, FSB, which in turn

was a wholly-owned subsidiary of Countrywide Financial Corporation, which in turn owned Countrywide Home Loans, Inc., who was doing business as America's Wholesale Lender, all of whom are now on information and belief owned by Defendant BAC Home Loan Servicing, LP.

72.     The legal definition of a Deed of Trust is: a legal document that evidences an agreement of a borrower to transfer legal title to real property to an impartial third party, a trustee, for the benefit of a lender, as security for the borrower's debt. West's Encyclopedia of American Law, edition 2. Copyright 2008, (The Gale Group,);   http://legaldictionary.thefreedictionary.com/Trust+Deed

73.     Defendant America's Wholesale Lender stated in the Deed of Trust that it was the lender. On information and belief, Defendant America's Wholesale Lender did not, in fact, lend any money to Plaintiff, contrary to the statement it made in the Deed of Trust and the Promissory Note. Plaintiff had relied on those statements to her detriment when she executed the Deed of Trust and has been harmed thereby as the true lender was never revealed to Plaintiff and the true lender had not received Plaintiff's monthly payments and her Promissory Note had been paid off by third parties.

74.     At the time of the execution of the Deed of Trust, Defendants America's Wholesale Lender and ReconTrust Company failed to disclose to Plaintiff that Defendants were (i) one and the same, or (ii) the agents, servants and/or employees of each other and that, therefore, the trustee under the Deed of Trust was not "an impartial third party".    Defendant Recontrust Company and its agents (Does 1 – 5) knew that Defendant America's Wholesale Lender was in fact selling the Plaintiff's note into a securitized trust where the certificate holders were the actual beneficiaries of the Promissory Note and where the certificate holders were the actual and true lender.

75.     Defendants' characterization within the Deed of Trust that ReconTrust Company is a "trustee" was made to Plaintiff with Defendants' knowledge of its falsity and with the intent of

inducing Plaintiff to rely upon the purported impartiality of Defendant ReconTrust Company.
Defendant America's Wholesale Lender had the obligation of insuring that the trustee under the
Deed of Trust was an impartial third party.  Plaintiff justifiably relied upon Defendants'
characterization of ReconTrust Company as a *bona fide* trustee because the Deed of Trust is a
contract and Plaintiff was therefore entitled to the general assumption of the law of contracts
which holds that the parties to a contract will act in good faith and deal fairly without using
shifty and deceitful means to avoid their obligations.

76.     Defendant Recontrust was directed by its principals and/or agents Defendant America's
Wholesale Lender, Countrywide  to begin foreclosure proceedings against the Plaintiff when
neither Defendant Recontrust Company nor any of its agents, servants, employees or principals
had the authority to do so as they did not hold or own the Promissory Note nor did they have
authority to enforce said Note.

77.     As a result of Defendants' deceitful conduct, Plaintiff has been damaged in that she is
now threatened with the illegal confiscation of her home through a foreclosure process being
carried out <u>not</u> as the law demands, by an impartial third party, but rather by a "pretender lender"
who, although not the holder in due course of the Promissory Note, by way of a sham Deed of
Trust holds the power to foreclose "behind the back" of the court.

78.     The Plaintiff has suffered great emotional harm and distress, sleeplessness, anxiety, pain
and suffering and gastric pain associated with the defendant's conduct.  The defendant's conduct
was done willfully and wantonly, intentionally and with reckless disregard for the Plaintiff.

79.     WHEREFORE, Plaintiff prays for the following relief:
         a.     Declaratory relief and injunctive relief;
         b.     Actual, special and consequential damages;
         c.     Punitive damages;
         d.     Costs; and
         e.     Attorney's Fees.

**COUNT 7**
**VIOLATION OF RESPA**
**(12 U.S.C. 2601, et. Seq.)**
*Plaintiff v. Defendant BAC Home Loan Servicing, LP*

80.  Plaintiff repeats and realleges Paragraphs 1 - 36 inclusive, as if set forth in full herein.

81.  Defendant BAC Home Loan Servicing, LP, is the servicer of the subject mortgage loan. On August 11, 2009, Plaintiff sent by way of Certified Mail with Return Receipt a Qualified Written Request (QWR) under Section 6 of the Real Estate Settlement Procedures Act (RESPA) to Defendant requesting copies of all documents pertaining to the origination of the mortgage loan including (i) the Note with all attached Addendums and Riders and (ii) the Deed of Trust with all Riders.   [Exhibit 14 (a)]

82.  On September 9th, 2009, Plaintiff sent a second letter to Defendant Bank of America Home Loans Servicing, LP  requesting that she be provided with "the name and address of the current owner of the underlying note evidencing debt (the real party in interest) who is the only party with legal authority to foreclose." [Exhibit 14 (b)]

83.  On September 11, 2009  Litigation Specialist, Elsie Eisenberg, for Defendant BAC Home Loans Servicing responded to Plaintiff's QWR of August 11th, 2009  by stating that within 60 days (excluding Saturdays, Sundays and legal holidays) of receiving a Qualified Written Request, the servicer must resolve the complaint by correcting the account or giving a written statement of the reasons for its position. Said letter further directed Plaintiff to contact Paula Ryan–Apuzzo should Plaintiff have any questions. [Exhibit 14 (c)]

84..  On October 8th, 2009, Plaintiff sent by way of Certified Mail with Return Receipt a letter to Ms Eisenberg and Ms. Ryan-Apuzzo, acknowledging receipt of their letter of September 11, 2009, and requesting a meaningful response to Plaintiff's QWR. Specifically, Plaintiff:

//

1.     requested the name of "the person(s) or entity(ies) who actually own and possess the original Promissory Note bearing (Plaintiff's) signature in ink;"

2.     informed Defendant that the Promissory Note is a contract between Plaintiff and whoever owns that contract now and that, as such, Plaintiff has the absolute legal right to the proof that it still exists and to full and immediate disclosure of all documents, including copies of all pertinent information, related to the mortgage loan;

3.     further informed Defendant that Plaintiff's letter was a demand that the original promissory note signed by her in ink, as it exists today along with all endorsements, affixed or un-affixed allonges, and assignments, whether recorded or not, be produced for her inspection;

4.     expressed her concern that good and proper title to her property no longer existed and that the amounts claimed as owed by her were incorrect;

5.     requested among other things:

(i)   a certified copy of the front and back portion of the mortgage loan as it exists today along with all assignments whether recorded or not,

(ii)   all executed, recorded and "non-recordable" assignments associated with the mortgage loan including, but not limited to assignments, transfers, allonges, or other documents evidencing a transfer, sale or assignment of the Deed of Trust and/or Promissory Note from the inception of the mortgage loan to the present date,

(iii)   all records, electronic or otherwise, of assignments of the mortgage loan, promissory note, or servicing rights to the mortgage loan,

(iv)   the name of the document custodian (**not** the Trustee, the actual custodian) that safeguards and holds the "original" promissory note signed by Plaintiff in ink,

(v)   the name and date of the pooling and servicing agreement that governs Defendant BAC Home Loans Servicing, LP's servicing of the mortgage loan,

(vi)   where a copy of this agreement can be secured and, if this document is available through the Securities and Exchange Commission, <u>what the CIK filing number that corresponds to this document is;</u>

//

1    5.    asked  if Plaintiff would receive her original (signed in ink) promissory note
2  stamped "Cancelled & Paid In Full" when it is paid off or refinanced and, if not, why?
3  [Exhibit 14 (d)]

4

5  85.    In a letter dated November 9, 2009, Dilworth Paxson LLP, as counsel for Defendant
6  BAC Home Loans Servicing, LP , responded to Plaintiff's three letters by stating : "The current
7  owner of the Note is U.S. Bank National Association as Trustee for SARM 05-19XS, with an
8  address of 2530 South Parker Road 601, Aurora, CO 80014." Despite the specificity of
9  Plaintiff's questions and requests, *supra*, counsel for Defendant refused to respond to said
10  questions or furnish Plaintiff with the documents requested *supra*. Counsel for Defendant
11  disingenuously  justified said refusal by stating that (i) Plaintiff's requests were "overly broad,"
12  (ii)  the information sought by Plaintiff is "confidential" and  "involves trade secrets or other
13  proprietary information," and  (iii) Plaintiff's demands are "not in conformity with 12 U.S.C.
14  §2605." [Exhibit 14 (e)]

15

16  86.    12 U.S.C. §2605 provides that, after conducting an investigation, it is the duty of the loan
17  servicer to respond to borrower inquiries about the borrower's mortgage loan by providing the
18  borrower with a written explanation or clarification that includes the information requested by
19  the borrower, or an explanation of why the information requested is unavailable or cannot be
20  obtained by the servicer.

21

22  87.    One of the principal characteristics of securitization is that it erects barriers that prevent
23  the debtor from knowing who the true owner of the mortgage loan is and whether said loan,
24  when sold or transferred, has been legally and properly assigned. As already explained in
25  paragraph 25, unlike the two party (Borrower and Lender) mortgage finance model of the past,
26  the securitization model of mortgage finance has numerous different parties that all play an
27  independent role in originating, pooling, structuring, and servicing mortgage loans. Because of
28  this, securitization creates an opaque business structure that sharpens the mortgage industry's

1  advantage over the debtor in litigation while allowing members of the industry to hide from

2  judicial scrutiny within large structured financial deals. None of the information requested by

3  Plaintiff in her Qualified Written Request letters was overly broad, confidential, or in any way

4  involved trade secrets or other proprietary information. Defendant BAC Home Loans Servicing,

5  LP's characterization of Plaintiff's QWR as such is an attempt to frustrate, thwart, harass and

6  prevent Plaintiff from uncovering the truth about her mortgage loan: that, through Defendants'

7  securitization process, the chain of title to Plaintiff's property was broken and that none of the

8  instant Defendants have the right to foreclose upon it.

9

10  88.   WHEREFORE, Plaintiff prays for the following relief:
         a.    Declaratory relief and injunctive relief;
11         b.    Actual and statutory damages;
         c.    Costs; and
12         d.    Attorney's Fees.

13

14                              **COUNT 8**
15              **VIOLATION OF CALIFORNIA CIVIL CODE 2923.5**

16

17  89.   Plaintiff repeats and realleges Paragraphs 1 - 36, inclusive, as if set forth in full herein.

18

19  90.   California Civil Code § 2923.5(a) states:
         A mortgagee, trustee, beneficiary, or authorized agent may not file a notice of default on
20         an owner's principal residence for loans initiated between January 1, 2003 and December
         31, 2007 pursuant to Civil Code § 2924 until 30 days after contact is made as required by
21         § 2923.5(a)(2) or 30 days after satisfying the due diligence requirements as described in
22         subdivision (g).

23  91.   California Civil Code § 2923.5(g) defines "due diligence" as requiring the Defendants to
24
    have done all of the following affirmative actions prior to filing the Notice of Default and
25
    Election to Sell Under Deed of Trust:
26         a.    Attempting to contact the borrower by telephone at least three times at
27               different hours and on different days to discuss options to foreclosure;
               and,
28  //

b.   If the borrower does not respond within two weeks after the telephone calls, sending a certified letter, with return receipt requested, advising the borrower to contact the lender to discuss alternatives to foreclosure.

92.   Defendants failed to attempt to contact Plaintiff by telephone to discuss alternatives to foreclosure. All of Plaintiff's attempts to contact the Defendants to discuss alternatives to foreclosure failed because Defendants refused to discuss such alternatives with Plaintiff. The Notice of Default and Election to Sell Under Deed of Trust contains an attachment in the form of a declaration which falsely states: "BAC Home Loans Servicing, LP has contacted the borrower to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure." (Exhibit 8)

93.   WHEREFORE, Plaintiffs prays for the following relief:
   a.   An order that the Notice of Default is void;
   b.   An order that the foreclosure sale should be postponed indefinitely until options to avoid foreclosure are explored with the Plaintiff;  and
   c.   Costs.

## COUNT 9
## VIOLATION OF CALIFORNIA CIVIL CODE 2923.6

94.   Plaintiff repeats and realleges Paragraphs 1 - 36, inclusive, as if set forth in full herein.

95.   California Civil Code § 2923.6(a) states:
   The Legislature finds and declares that any duty servicers may have to maximize net present value under their pooling and servicing agreements is owed to all parties in a loan pool, not to any particular parties, and that a servicer acts in the best interests of all parties if it agrees to or implements a loan modification or workout plan for which both of the following apply:

   1.   The loan is in payment default, or payment default is reasonably foreseeable.
   2.   Anticipated recovery under the loan modification or workout plan exceeds the anticipated recovery through foreclosure on a net present value basis.

//

96.     As alleged, the subject loan is in payment default to some entity, but not to any of the named Defendants.  In addition, the anticipated recovery from a loan modification in which the interest rate is reduced and the term is extended will likely result in a modification which is affordable to Plaintiff and which exceeds the anticipated recovery through foreclosure on a net present value basis.

97.     WHEREFORE, Plaintiff prays for the following relief:
   a.     Declaratory and injunctive relief that Defendants must offer a loan modification to Plaintiff which complies with § 2923.6 — one in which "the anticipated recovery exceeds the anticipated recovery through foreclosure on a net present value basis".  This loan modification must also be one which the Plaintiff can afford and which would not result in an inevitable foreclosure
   b.     Costs.

## COUNT 10
## VIOLATION OF
## CALIFORNIA BUSINESS AND PROFESSIONS CODE 17200, et. seq.

98.     Plaintiff repeats and realleges Paragraphs 1 - 36, inclusive, as if set forth in full herein.

99.     The Court has jurisdiction over this action pursuant to Business and Professions Code § 17200 et seq , specifically Business and Professions Code § 17203, which provides any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction; and the court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition; and Business and Professions Code § 17204, which provides for actions for any relief pursuant to the Unfair Competition Law to be prosecuted exclusively in a court of competent jurisdiction by any board, officer, person, corporation or association or by any person acting for the interests of itself, its members or the general public.

100.    At all times relevant to this Complaint, Defendants were lenders, creditors or agents or principals of lenders and creditors, who were in the business of providing residential mortgages to the general public and were acting within the scope of that business with regard to the loan provided to Plaintiff.

101.    As set forth above, the predicate unlawful business acts and/or practices include all Defendants' failures to comply with California Civil Code §§ 2921.5, 2923.5, 2923.6, 12 USC 1710a, 12 U.S.C. 5200 et. seq., 15 USC 1692, et. seq.

102.    All Defendants acted unlawfully in that they violated California Civil Code §§ 2921.5, 2923.5, 2923.6, 12 USC 1710a, 12 USC. 5200 et. seq., and, 15 USC 1692, et. seq.

103.    Plaintiff is informed and believes, and based thereon alleges, that the illegal acts of Defendants are a serious threat to Plaintiff because these illegal acts have allowed, or will allow, Defendants to wrongfully foreclose on the Subject Property, transfer title or interest of the Subject Property, and to cause the imminent eviction of Plaintiff from her home.  Because of Defendants' illegal actions, Plaintiff will be forced out of the Subject Property.   Such eviction will cause Plaintiff to suffer further immediate and irreparable injury, loss, and damage.

104.    As a direct, proximate, and foreseeable result of the unlawful conduct of Defendants, their business acts or practices have caused injury to Plaintiff and the public; and Plaintiff is entitled to relief, including full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of such business acts or practices.

105.    As a direct and proximate result of Defendants' unlawful conduct alleged herein, Plaintiff has also lost equity in her home and may lose her home through foreclosure.

//

106.    In addition to the relief requested in the Prayer below, Plaintiff seeks the imposition of a constructive trust over, and restitution of the monies collected and realized by Defendants.

107.    WHEREFORE, Plaintiff prays for the following relief:
   a.    Restitution, including disgorgement of all profits accruing to Defendants because of its unlawful and deceptive acts and practices;
   b.    Declaratory relief and injunctive relief;
   c.    Costs; and,
   d.    Attorney's fees.

## COUNT 11
## VIOLATION OF
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

108.    Plaintiff repeats and realleges Paragraphs 1- 36, inclusive, as if set forth in full herein.

109.    Defendant America's Wholesale Lender entered into written agreements with Plaintiff based upon the terms on the mortgage loan documents, and allegedly still holds the Promissory Note. Defendant MERS interjected itself as a party in the execution of the Security Instrument as identified by its name in that section in type print.

110.    At all times relevant, Defendants unreasonably denied Plaintiff the benefits promised to her under the terms of federal law and the Promissory Note by failing to transfer her payments to the certificate holder investors and by failing to abide by federal law as they stated they would. That failure in particular being the failure to comply with 12 USC 1710a and HAMP.

111.    The Defendants' breaches, as alleged herein, were committed with willful and wanton disregard for whether or not Plaintiff would actually have her payments made to the true beneficiary of the Promissory Note, and for whether or not Plaintiff was entitled to a loan modification under HAMP.

112.    Upon information and belief and at all times relevant, Defendants possessed full knowledge and information concerning the above facts about these loans, and otherwise sold these loans throughout the United States, including the State of California.

113.    The Defendants' placing of its corporate and/or individual profits over the rights of others is particularly vile, base, contemptible, and wretched and said acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate Defendant and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions. The Defendants thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiff and the General Public.

114.    At all times relevant, the Defendants' conduct, as alleged herein, was malicious, oppressive, and/or fraudulent.

115.    As a result of the Defendants' conduct, Plaintiff has suffered harm. The Plaintiff has incurred additional and unlawful charges to the principal loan balance.

116.    WHEREFORE, Plaintiff prays for the following relief:
      a.     Declaratory relief and injunctive relief;
      b.     Actual damages;
      c.     Punitive damages;
      d.     Costs; and,
      c.     Attorney's fees.

November 17, 2009

*Berenice Thoreau de la Salle*

Berenice Thoreau de la Salle, In Pro Per

First Amended Complaint for Declaratory Relief, Injunctive Relief, and Damages  - 35

EXHIBIT 1

Prepared by: KARINA HUERTAS

LOAN #: 90183338

# ADJUSTABLE RATE NOTE
### (MTA - Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

APRIL 25, 2005                          BURBANK                          CALIFORNIA
[Date]                                   [City]                           [State]

1687 FOREST TRAIL, MAMMOTH LAKES, CA 93546
[Property Address]

## 1.   BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 668,000.00          (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed          115   percent of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is AMERICA'S WHOLESALE LENDER

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.   INTEREST
(A)  Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      1.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

(B)  Interest Rate Change Dates
The interest rate I will pay may change on the first                      day of JUNE, 2005                , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

(C)  Index
Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D)  Calculation of Interest Rate Changes
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE & 575/1000          percentage point(s)   3.575 ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than      9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3.   PAYMENTS
(A)  Time and Place of Payments
I will make a payment every month.
I will make my monthly payments on the first                  day of each month beginning on
JUNE 01, 2005              . I will make these payments every month until I have paid all the Principal and interest and any

I HEREBY CERTIFY THIS TO BE
A TRUE AND CORRECT COPY
OF THE ORIGINAL                Page 1 of 4
BY _____
Escrow Officer

● PayOption ARM Note - MTA Index
2E306-XX (12/04)(d)





LOAN #: 90183338

other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  MAY 01, 2035  , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

### (B)   Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 2,148.55  , unless adjusted under Section 3(F).

### (C)   Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the first  day of JUNE,  2006  , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D)   Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

### (E)   Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

### (F)   Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN  percent ( 115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

### (G)   Required Full Payment

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

### (H)   Payment Options

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options;

(i)    Interest Only Payment:  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)   Fully Amortized Payment:  the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments.

(iii)  15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

OF THE ORIGINAL

* PayOption ARM Note - MTA Index       BY _____
2E306-XX (12/04)                       Escrow Officer        Page 2 of 4

LOAN #: 90183338

These Payment Options are only applicable if they are greater than the Minimum Payment.

**NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   .   5.000 % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

I CERTIFY THIS TO BE

BY _____
Escrow Officer

LOAN #: 90183338

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

_Berenice de la Salle_

BERENICE DE LA SALLE                                                              - Borrower

_____                                          - Borrower

_____                                          - Borrower

_____                                          - Borrower

I HEREBY CERTIFY THIS TO BE
A TRUE AND CORRECT COPY
OF THE ORIGINAL

BY _____
        Escrow Officer

● **PayOption ARM Note - MTA Index**
2E306-XX (12/04)                                      Page 4 of 4

Prepared by: KARINA HUERTAS

**AMERICA'S WHOLESALE LENDER**

DATE:       04/26/2005
BORROWER: BERENICE DE LA SALLE
CASE #:
LOAN #:       90183338
PROPERTY ADDRESS: 1687 FOREST TRAIL
                MAMMOTH LAKES, CA 93546

Branch #: 0000909
20970 WARNER CENTER LN, STE. C
WOODLAND HILLS, CA 91367
Phone: (800) 299-3324
Br Fax No.: (818) 888-2270

## PREPAYMENT PENALTY ADDENDUM

THIS PREPAYMENT PENALTY ADDENDUM is dated   APRIL 25,  2005        , and is incorporated into and amends and supplements the Note of the same date (the "Note") given by me to
AMERICA'S WHOLESALE LENDER
(the "Lender"). The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") covering the property (the "Property") identified in the Security Instrument.

The section of the Note entitled "Borrower's Right to Prepay" is replaced with the following new section:

BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid Principal is known as a "Full Prepayment." A prepayment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Partial or Full Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial Prepayments of my obligation. The Note Holder will use all of my prepayments to reduce the amount of Principal that I owe under the Note. If I make a Partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment.

If within the first THIRTY SIX months after the execution of this Note, I make prepayment(s), the total of which exceeds twenty (20) percent of the original Principal amount of this Note, I agree to pay a Prepayment Penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) during the twelve (12) month period immediately preceding the date of the prepayment exceeds twenty (20) percent of the original Principal amount of this Note. Interest will be calculated using the rate in effect at the time of prepayment.

● Multistate Prepayment Penalty Addendum
1E296-XX (01/05)(d)

Page 1 of 2





I HEREBY CERTIFY THIS TO BE
A TRUE AND CORRECT COPY
OF THE ORIGINAL.
BY _____
Escrow Officer

All other terms and conditions of the above referenced Note remain in full force and effect.

Berenice de la Salle

BERENICE DE LA SALLE                                                  Borrower

_____

                                                                     Borrower

_____

                                                                     Borrower

_____

                                                                     Borrower

● Multistate Prepayment Penalty Addendum
1E298-XX (01/05)                          Page 2 of 2

I HEREBY CERTIFY THIS TO BE
A TRUE AND CORRECT COPY
OF THE ORIGINAL
BY _____
        Escrow Officer

EXHIBIT 2

RECORDED AT THE REQUEST OF
CHICAGO TITLE COMPANY

Recording Requested By:
L. DROKE

Doc # 2005003675
Page 1 of 24
Date: 5/10/2005 01:53P
Filed by: GENERAL PUBLIC
Filed & Recorded in Official Records
of MONO COUNTY
RENN NOLAN
CLERK-RECORDER
Fee: $148.00

After Recording Return To:
COUNTRYWIDE HOME LOANS INC.

MS SV-79 DOCUMENT PRO
P.O.Box 10423
Van Nuys, CA 91410-04
Prepared By:
KARINA HUERTAS

610  090183338  D2  001  001

48519380

[Space Above This Line For Recording Data]

17845DD
[Escrow/Closing #]

0009018333804005
[Doc ID #]

## DEED OF TRUST

MIN 1000157-0001437472-8

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated APRIL 25, 2005       , together with all Riders to this document.
(B) "Borrower" is
BERENICE DE LA SALLE, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 16

-6A(CA) (0207)      CHL (09/02)(d)     VMP MORTGAGE FORMS - (800)521-7291
CONV/VA

Initials: BS

Form 3005 1/01





DOC ID #: 0009018333804005

Borrower's address is
1687 FOREST TRAIL, MAMMOTH LAKES, CA 93546
Borrower is the trustor under this Security Instrument.
(C) "Lender" is
AMERICA'S WHOLESALE LENDER
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
P.O. Box 10219, Van Nuys, CA 91410-0219
(D) "Trustee" is
ReconTrust Company, N.A
225 West Hillcrest Dr., MSN TO-02, Thousand Oaks91360
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this
Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated APRIL 25, 2005        . The
Note states that Borrower owes Lender
SIX HUNDRED SIXTY EIGHT THOUSAND and 00/100

Dollars (U.S. $ 668,000.00      ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than MAY 01, 2035         .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association
or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage
to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

-6A(CA) (0207)        CHL (09/02)              Page 2 of 16                    Initials: ___ BIS
                                                                              Form 3005 1/01

DOC ID #: 0009018333804005

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY of MONO :
[Type of Recording Jurisdiction]       [Name of Recording Jurisdiction]
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 31 120 23                         which currently has the address of
1687 FOREST TRAIL, MAMMOTH LAKES
[Street/City]

California    93546    ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

Initials: BIS

-6A(CA) (0207)       CHL (09/02)       Page 3 of 16              Form 3005 1/01

DOC ID #: 0009018333804005

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

@-6A(CA) (0207)          CHL (08/02)                    Page 4 of 16                              Initials: [signature]

                                                                                                  Form 3005   1/01

DOC ID #: 0009018333804005

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

-6A(CA) (0207)          CHL (09/02)          Page 5 of 16          Initials: BIS          Form 3005 1/01

DOC ID #: 0009018333804005

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of

-6A(CA) (0207)          CHL (09/02)          Page 6 of 16          Initials: ___          Form 3005 1/01

DOC ID #: 0009018833804005

paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

-6A(CA) (0207)          CHL (09/02)              Page 7 of 16                              Initials: _____

Form 3005 1/01

DOC ID #: 0009018333804005

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

DOC ID #: 0009018333804005

shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

DOC ID #: 0009018333804005

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

DOC ID #: 0009018333804005

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

Initials: BIS

-6A(CA) (0207)   CHL (09/02)   Page 11 of 18   Form 3005 1/01

DOC ID #: 0009018333804005

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in

-6A(CA) (0207)        CHL (09/02)            Page 12 of 16                    Initials: _____ BIS          Form 3005 1/01

DOC ID #: 0009018333804005

compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

-6A(CA) (0207)          CHL (09/02)          Page 13 of 16          Initials: BIS          Form 3005 1/01

DOC ID #: 0009018333804005

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

-6A(CA) (0207)          CHL (08/02)          Page 14 of 16          Initials: BS     Form 3005 1/01

DOC # 20050003675
Page 15 of 24

DOC ID #: 0009018333804005

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _Berenice de la Salle_____ (Seal)
_____    BERENICE DE LA SALLE                -Borrower

_____    _____ (Seal)
                                                              -Borrower

                             _____ (Seal)
                                                              -Borrower

                             _____ (Seal)
                                                              -Borrower

-6A(CA) (0207)    CHL (09/02)    Page 15 of 16    Form 3005 1/01

DOC ID #: 0009018333804005

State of California
County of *Mono*

On *April 28, 2005* before me, *Grace A. Lohr*

personally appeared

*Berenice de la Salle*

, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

*Grace A. Lohr* (Seal)

GRACE A. LOHR
COMM. # 1318080
NOTARY PUBLIC-CALIFORNIA
MONO COUNTY
COMM. EXP. SEPT. 14, 2005

-8A(CA) (0207).    CHL (09/02)    Page 16 of 16

Initials: BS

Form 3005 1/01

DOC # 2005003675
Page 17 of 24

# ADJUSTABLE RATE RIDER
### (PayOption MTA Twelve Month Average Index - Payment Caps)

17845DD                           0009018333804005
[Escrow/Closing #]                 [Doc ID #]

THIS ADJUSTABLE RATE RIDER is made this  TWENTY-FIFTH        day of
APRIL, 2005        , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by
the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
AMERICA'S WHOLESALE LENDER

("Lender") of the same date and covering the property described in the Security Instrument and
located at:
                    1687 FOREST TRAIL
                MAMMOTH LAKES, CA 93546
                     [Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE
MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY
PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD
BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE
MAXIMUM LIMIT STATED IN THE NOTE.**

   **ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agrees as follows:

   **A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   The Note provides for changes in the interest rate and the monthly payments, as follows:

**• PayOption MTA ARM Rider**
**1E310-XX (12/04)(d)**              Page 1 of 6





DOC ID #: 0009018333804

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          1.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first          day of JUNE, 2005          , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

### (C) Index

Beginning with the first Interst Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding          THREE & 575/1000 percentage point(s) (          3.575 %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than          9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the FIRST          day of each month beginning on June, 2005          . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MAY 01, 2035          , I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

**• PayOption MTA ARM Rider**
**1E310-XX (12/04)**                    Page 2 of 6

DOC ID #: 0009018333804005

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410—0219

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments
Each of my initial monthly payments until the first Payment Change Date will be in the amount of
U.S. $ 2,148.55                                , unless adjusted under Section 3·(F).

### (C) Payment Change Dates
My monthly payment may change as required by Section 3(D) below beginning on the
first            day of JUNE,  2006           , and on that day every 12th
month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also
will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.
The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment
which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If
the Minimum Payment is not sufficient to cover the amount of the interest due then negative
amortization will occur.
I will pay the amount of my new Minimum Payment each month beginning on each Payment
Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of
the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe
at the Payment Change Date in full on the maturity date in substantially equal payments at the interest
rate effective during the month preceding the Payment Change Date. The result of this calculation is
called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment
effective on a Payment Change Date, will not increase by more than 7.5% ·of my prior monthly
payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the
Principal and interest payment and does not apply to any escrow payments Lender may require under
the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my
Minimum Payment due the month preceding the Payment Change Date and· multiplying it by the
number 1.075. The result of this calculation is ·called the "Limited Payment." Unless Section 3(F) or
3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the
Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly
payment.

**•  PayOption MTA ARM Rider**
**1E310-XX (12/04)**                      Page 3 of 6

DOC ID #: 0009018333804005

**(E) Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**
My      unpaid    Principal     can    never    exceed    the    Maximum     Limit    equal    to
ONE HUNDRED FIFTEEN percent (            115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options;
          (i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
          (ii) **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
          (iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

**• PayOption MTA ARM Rider**
**1E310-XX (12/04)**                    Page 4 of 6

DOC ID #: 0009018333804005

These Payment Options are only applicable if they are greater than the Minimum Payment.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by

**• PayOption MTA ARM Rider
1E310-XX (12/04)**                    Page 5 of 6

DOC ID #: ·0009018333804005

this Security Instrument. If Borrower fails to· pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____Berenice de la Salle_____

BERENICE DE LA SALLE                                                   -Borrower

_____
                                                                      -Borrower

_____
                                                                      -Borrower

_____
                                                                      -Borrower

● PayOption MTA ARM Rider
1E310-XX (12/04)                     Page 6 of 6

Prepared by: KARINA HUERTAS

**AMERICA'S WHOLESALE LENDER**

DATE:        04/25/2005
CASE.#:
DOC ID #:    0009018333804005
BORROWER: BERENICE DE LA SALLE
PROPERTY ADDRESS: 1687 FOREST TRAIL
            MAMMOTH LAKES, CA 93546

Branch #: 0000909
20970 WARNER CENTER LN, STE. C
WOODLAND HILLS, CA 91367
Phone: (800)299-3324
Br Fax No.: (818)888-2270

### LEGAL DESCRIPTION EXHIBIT A

FHA/VA/CONV
• Legal Description Exhibit A
1C404-XX (04/03)(d)





# EXHIBIT A

DOC # 2005003675
Page 24 of 24

LOT 111 OF MAMMOTH SLOPES UNIT NO. 3, IN THE TOWN OF MAMMOTH LAKES, COUNTY OF FRESNO, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 5, PAGES 85 THROUGH 85E OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXHIBIT 3

MERS - State Foreclosure Details : file:///C:/Users/O...or/Desktop/WORK/Foreclosure/Documents/S...

Case 2:09-cv-02701-MCE -KJM   Document 11   Filed 11/18/09   Page 69 of 131



 Close Window

**MERS Recommended Foreclosure Procedures for**

# FLORIDA

*Version 1.1, 11 November 1999*

Foreclosing a loan in the name of Mortgage Electronic Registration Systems, Inc. is something new in the foreclosure arena. However, when the role of MERS is examined, it becomes clear that MERS stands in the same position to foreclose as the servicer. MERS, like the servicer, will be the mortgagee of record. It is the mortgage that gives MERS the authority to foreclose.

To help make a smooth transition from foreclosing loans in the name of the servicer to foreclosing loans in the name of MERS, we have developed state by state recommended guidelines to follow. These guidelines were developed in conjunction with experienced foreclosure counsel in your state. We have been able to keep the MERS recommended procedures consistent with the existing foreclosure procedures. The goal of the recommended procedures is to avoid adding any extra steps or incurring any additional taxes or costs by foreclosing in the name of MERS instead of the servicer.

MERS will continually review the guidelines and, if necessary, will issue revisions. The recommended guidelines to follow in your state are as follows:

Mortgages are typically used and are foreclosed judicially. MERS local counsel advises that a loan can be foreclosed in the name of MERS. When MERS has been assigned the mortgage, the caption of the complaint should state Mortgage Electronic Registration Systems, Inc. as the plaintiff. However, this changes slightly if MERS is the original mortgagee of record, meaning that MERS is named on the mortgage in a nominee capacity for the originating lender. The caption should then state Mortgage Electronic Registration Systems, Inc. as nominee for [insert name of the current servicer]. The key is how MERS is named as the mortgagee of record.

The body of the complaint should be the same as when foreclosing in the name of the servicer. MERS stands in the same shoes as the servicer to the extent that it is not the beneficial owner of the promissory note. An investor, typically a secondary market investor, will be the ultimate owner of the note.[1]

The agencies (Fannie Mae, Freddie Mac and Ginnie Mae) require a blank endorsement of the promissory note when the seller/servicer sells a mortgage loan to them. Therefore, the note should remain endorsed in blank when the foreclosure is commenced unless it is legally required to be endorsed to the foreclosing entity and not just the preferred method. If it is required to endorse the promissory note to the foreclosing entity, then the note may need to be endorsed to MERS. However, we have not found it a requirement in Florida that the Note needs to be endorsed to the foreclosing entity.[2]

MERS - State Foreclosure Details                    file:///C:/Users/Q...tor/Desktop/WORK/Foreclosure/Documents/S...

Case 2:09-cv-02701-MCE -KJM    Document 11    Filed 11/18/09    Page 70 of 131

Employees of the servicer will be certifying officers of MERS. This means they are authorized to sign any necessary documents as an officer of MERS. The certifying officer is granted this power by a corporate resolution from MERS. In other words, the same individual that signs the documents for the servicer will continue to sign the documents, but now as an officer of MERS.

After a foreclosure judgment to MERS is entered, a public sale is held. The Plaintiff (MERS) has the option of assigning the foreclosure bid either prior to the foreclosure sale or in the ten (10) day period between the sale and the issuance of the Certificate of Title. The assignment is done with a motion filed with the court, and a court order is entered. If the bid is assigned, the certificate of title is issued directly to the assignee. This is the same method that is used when the servicer forecloses in its own name. Because the MERS recommended procedure follows the same procedure that is used when the servicer forecloses in its name, no additional recording or transfer taxes are incurred by foreclosing in the name of MERS.

Evictions are handled the same way they are handled when the servicer commences the foreclosure as the foreclosing entity. If it is an FHA-insured loan and an eviction is necessary, then the bid assignment is given to the servicer instead of to HUD. This way, the servicer will proceed with the eviction the same way it would if the foreclosure were filed in its own name.

If the debtor declares bankruptcy, then proof of claim should be filed jointly in the name of Mortgage Electronic Registration Systems, Inc. and the servicer. It is advised to file in both names in order to disclose to the court the relationship of MERS and the servicer. The address to be used is the servicer's address so that all trustee payments go directly to the servicer, not to MERS. The Motion for Relief from Stay may be filed either solely in the name of MERS or jointly with the servicer. If MERS is the foreclosing entity, then it is MERS that needs the relief from the bankruptcy.

------------------------------------------------------------------------

1 Even though the servicer has physical custody of the note, custom in the mortgage industry is that the investor (Fannie Mae, Freddie Mac, Ginnie Mae or a private investor) owns the beneficial rights to the promissory note.

Back to reading

2 If the promissory note is endorsed in blank and the servicer has physical custody of the note, the servicer will technically be the note holder as well as the record mortgage holder. By virtue of having the servicer's employees be certifying officers of MERS, there can be an in-house transfer of possession of the note so that MERS is considered the note holder for purposes of foreclosing the loan.

Back to reading

EXHIBIT 4

*1687 Forest Trail*
*Mammoth Lakes, CA 93546*
*(760) 934 9584*
*(760) 937 5645 cell*

January 5th , 2009

CERTIFIED MAIL; RETURN RECEIPT REQUESTED

Countrywide Mortgage Co.
Home Owner Retention Department
SV-314B
P.O. Box 5170
Simi Valley, CA 93062

Re:   Countrywide Loan No: 090183338
      Property Address: 1687 Forest Trail, Mammoth  Lakes, CA 93546

Dear Lender,

Following my telephone call to your division this morning, I am writing for your assistance. I need your help in order to keep my home from foreclosure. I am a real estate agent for Coldwell Banker in Mammoth Lakes, California, and the sole wage earner for my family. My husband is 83 years of age. Due to a condition of renal failure that he suffered in 2007 I was required to give him special care, which temporarily interfered with my ability to work. That year I was forced to live off of my savings while caring for him, a situation which depleted the reserves I normally keep in order to face an economic downturn.

Since then, I have been able to resume work but, given the current crisis in real estate, the credit markets, and the economy in general, coupled with my depleted savings, I have suffered a financial reversal and am unable to meet my current mortgage payments. I am currently (i) four months behind on the payments for my Second Mortgage (with IndyMac) and (ii) three months behind on the payments for my First Mortgage (with Countrywide). My current payments are as follows:

| Lender | Monthly Payment | % Rate |
|---|---|---|
| First Trust Deed; Countrywide (Pay Option ARM) | $2,669.14 | 4.25 |
| Second Trust Deed: IndyMac | $1,297.17 | 7.75 |
| Total | $3,966.31 | |

For the year 2008, I have earned $76,644. I anticipate that I will earn the same amount over the year 2009. Additionally, my husband receives $1,884 annually from the French Social Security System which brings our total annual revenues to $78,528. At present, my mortgage payments, when coupled with monthly property taxes ($244.55) and home owner's insurance ($157.41) represent 67% of my total annual income—a DTI which I cannot sustain. I would like to discuss the possibility of a loan modification that would achieve sustainable payments at a 35% debt-to-income ratio of principal, interest, taxes and insurance. To do this, my mortgage payments would need to come to a total figure of $1,856.

At the time that the Second Mortgage with IndyMac was obtained on my home in January of 2006, the property's appraised value came to $1,010,000. Since then, real estate values in Mammoth Lakes (a ski resort that is heavily populated with second homeowners) have plummeted. The decline for new construction (or homes which have been entirely remodeled) has been between 30% and 35% from the peak valuations reached at the beginning of 2006. For older construction the decline has been between 35% and 40%. Prices are still dropping at a rate of 1 to 2% per month. My home was built in 1987 and is in its original condition. For this reason, I estimate that its current market value is $628,475 which represents a 37.7% drop from its peak value reached in January of 2006.

The current debt on the property is as follows:

> $84,960.20 of this amount is attributed to Negative Amortization

| | |
|---|---|
| First Mortgage to Countrywide | $ 752,960.20 |
| Second Mortgage to IndyMac | $ 202,274.15 |
| **Total** | **$ 955,234.35** |

Assuming that I can renegotiate the terms of my loan with Countrywide according to the options provided by your *Home Ownership Retention Program*[1] initiated on December 1st, I would then renegotiate the terms of the Second Mortgage with Indymac. I am hoping that a modified mortgage workout plan would look like this:

| Creditor | Restructured Debt | % Loan to Current Market Value | New Equity based on Current MV of $628,475 | Interest Rate | New Monthly Payment | DTI as a % of Monthly Income |
|---|---|---|---|---|---|---|
| Countrywide | $597,051.25 | 95% | $31,423.75 | 3.25% | $1,741.40 | 24.71% |
| IndyMac | $67,492.75 | NA | ($36,069.00) | 4.25% | $239.04 | 3.65% |
| **Total** | **$664,544.00** | | | | **$1,856.05** | **28.36%** |

[1] As my First Mortgage is a Pay Option ARM, and I meet all of the requirements set out in the Home Ownership Retention Program, I am hoping I am eligible for a streamlined loan modification plan from Countrywide whereby (i) the negative amortization feature would be eliminated from the loan, (ii) the mortgage interest rate could be reduced, (iii) the loan could be converted to a ten year interest only loan, and (iv) the principal balance could be written down to 95% of the current value of the property.

When Taxes and insurance are added to the above monthly costs my total DTI to income will come in at 35%.

There is currently no equity in the property: the First Mortgage to Countrywide represents $124,485 more than the estimated market value of the house. The First and Second Mortgages together represent $326,759 more than the property's estimated market value. Given the above, this offer is the best that I can reasonably and honestly propose.

I am attaching a breakdown of my Revenues and Expenses along with this proposal. If there is any additional information I might provide, please let me know immediately. My cell phone number is (760) 937 5645 and the best time to reach me is between 8:30 and 11:30 each morning.

Thank you very much for your consideration and assistance in helping me save my home from foreclosure.

Respectfully,

Berenice de la Salle

Enc.

Proof of Income
Excel Sheets:  Revenues and Expenses
              Mortgage Work Out Plan
              Market Valuation of Property

Loan No: 0901 83338



**MAMMOTH
REAL ESTATE**

P.O. BOX 1059
3293 MAIN STREET
MAMMOTH LAKES, CA 93546
BUS. (760) 934-2562
BUS. (800) 266-6966
FAX (760) 924-0250
www.MammothRealEstate.com

November 11, 2008

To:      Berenice de la Salle

From:    George S. Fowler

Re:      Commission Rollover

1. I am enclosing a copy of your production from October 1, 2007 to September 30, 2008. You have achieved a total of $61,513.03. Additionally, the total amount of $15,131.65 that was deducted to pay back your loan has been added to the total to determine your commission. You have achieved a total of ████████████

2. According to the 2008 commission schedule this qualifies you for a 65% split for the next 6 months.

3. Keep up the good work, if you have any questions please do not hesitate to contact me.

De la Salle 11 11 08

NET INCOME    $76,644.68

PLUS          1,824.00 Social Security

Total         $78,528.64

Loan No 090133338

**Revenues and Expenses**
2008

| Revenues | Monthly | Annual |
|---|---|---|
| Berenice | $6,387.06 | $76,644.68 |
| Pierre *(Social Security from France)* | $157.00 | $1,884.00 |
| **Total** | **$6,544.06** | **$78,528.68** |

| Expenses | Monthly | Annual | % of Income | | Proposed Monthly | Proposed Annually | % of Income | DTI |
|---|---|---|---|---|---|---|---|---|
| 1st Mortgage, Countrywide | $2,669.14 | $32,029.68 | 40.79% | | *$1,617.01* | *$19,404.12* | *24.71%* | **30.85%** |
| 2nd Mortgage, IndyMac | $1,297.17 | $15,566.04 | 19.82% | | *$239.04* | *$2,868.48* | *3.65%* | ← |
| Property Taxes | $244.55 | $2,934.60 | | | *$244.55* | *$2,934.60* | *3.74%* | |
| Home Owners Insurance | $157.41 | $1,888.92 | | | *$157.41* | *$1,888.92* | *2.41%* | |
| **Current DTI** | **$4,368.27** | **$52,419.24** | **66.75%** | | *$2,258.01* | *$27,096.12* | *34.50%* | *Proposed DTI* |

If I can work out a loan modification with Countrywide, I will then work out something with ←

| *Cost of Living* | | | | |
|---|---|---|---|---|
| Life Insurance | $68.25 | $819.04 | | |
| Water | $44.00 | $528.00 | | |
| Electricity | $52.06 | $624.76 | | |
| *Heat* | *$200.00* | *$2,400.00* | | |
| *Cable TV* | *$43.80* | *$525.60* | | |
| *Medical Bills* | *$250.00* | *$3,000.00* | | |
| Pharmacy | $120.00 | $1,440.00 | | |
| Repairs to House | $166.67 | $2,000.00 | | |
| Snow Removal | $62.50 | $750.00 | | |
| Food | $733.00 | $8,796.00 | | |
| Waste Disposal | $11.43 | $137.20 | | |
| Gardener | $47.92 | $575.00 | | |
| Clothing and Personal Maintenance | $64.58 | $775.00 | | |
| Miscellaneous | $50.00 | $600.00 | | |
| *Back Property Taxes* | *$455.40* | *$5,464.78* | | |
| **Sub Total** | **$1,914.22** | **$22,970.60** | **29.25%** | |

| *Cost of Business* | | | | |
|---|---|---|---|---|
| Internet Service Provider (NPG) | $49.95 | $599.40 | | |
| AOL | $25.90 | $310.80 | | |
| Telephone | $77.28 | $927.32 | | |
| Cell Phone | $150.00 | $1,800.00 | | |
| Realtor Fees and Dues | $103.25 | $1,239.00 | | |
| Office Supplies | $75.00 | $900.00 | | |
| Car Payments, Alta One | $365.04 | $4,380.48 | | |
| Car Insurance | $87.23 | $1,046.76 | | |
| AAA Automobile Club | $8.33 | $100.00 | | |
| Gas | $145.00 | $1,740.00 | | |
| *Repairs and Maintenance for Car* | *$41.67* | *$500.00* | | |
| DMV | $25.83 | $310.00 | | |
| Job Related Education | $40.00 | $480.00 | | |
| *Web Site Maintenance* | *$50.00* | *$600.00* | | |
| *Computer Expenses* | *$25.00* | *$300.00* | | |
| Job Related Travel/Entertainment | $50.00 | $600.00 | | |
| Preparation of Tax Returns | $22.08 | $265.00 | | |
| *Monthly Payments to IRS, Back Taxes* | *$105.00* | *$1,260.00* | | |
| **Sub Total** | **$1,446.56** | **$17,358.76** | **22.10%** | |

| *Plus Estimated Annual Tax Liability to IRS* | *$850.73* | *$10,208.73* | *13.00%* | | | | % of Income | |
|---|---|---|---|---|---|---|---|---|
| **Grand Total of Expenses** | **$8,579.78** | **$102,957.33** | **131.11%** | | $6,469.52 | $77,634.21 | 98.86% | |
| Current Revenue Shortfall/ Proposed Surplus | $2,035.72 | $24,428.65 | 31.11% | | $74.54 | $894.47 | 1.14% | |

09-cv-23338

**Comparison of 1687 Forest Trail to Comparable Sales and Active Listings**

> We have been dropping at an approximate rate of 1% per month since the Peak of the Market in the Beginning of 2006

| Address | Status | Square Footage | Beds | Baths | Furnished | Acres | Year Built | List Price | Price per Sq. Foot | District | Sale Price | Price per Sq. Foot | Date of Sale | Days on Market | Drop Since Sale | Current Market Value | Current Price per Sq. Foot |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1687 Forest Trail | Owner Occupied | 2186 | 3 | 3.5 | No | 0.17 | 1987 | $622,000 | $284.54 | Mammoth Slopes III | | | | | | | |
| 26 Rainbow Lane | Sold | 3000 | 5+ | 4.5 | No | 0.20 | 2003 | $1,074,900 | $358.30 | Mammoth Slopes III | $1,074,900 | $358.30 | 1/11/2008 | 39 | 12.00% | $945,912 | $315.30 |
| 1706 Forest Trail | Sold | 1960 | 3 | 2.5 | No | 0.18 | 1985 | $565,000 | $298.47 | Mammoth Slopes III | $565,000 | $288.27 | 1/14/2008 | 40 | 12.00% | $497,200 | $253.67 |
| 155 Monterey Pine Rd. | Sold | 2382 | 4 | 2.5 | No | 0.19 | 1990 | $789,000 | $331.23 | Majestic Pines III | $750,000 | $314.86 | 3/11/2008 | 61 | 9.00% | $682,500 | $286.52 |
| 382 Hillside Dr. | Sold | 2800 | 4 | 1.5 | Yes | 0.22 | 1979 | $799,000 | $285.36 | Mammoth Slopes IV | $760,000 | $271.43 | 3/26/2008 | 183 | 9.00% | $691,600 | $247.00 |
| 415 Hillside Dr. | Sold | 2450 | 4 | 3 | Partial | 0.17 | 1982 | $995,000 | $406.12 | Mammoth Slopes V | $975,000 | $397.96 | 4/12/2008 | 291 | 8.00% | $897,000 | $366.12 |
| 84 Sugar Pine | Sold | 1847 | 4 | 3 | Yes | 0.23 | 1991 | $739,900 | $400.60 | Majestic Pines III | $669,000 | $362.21 | 6/25/2008 | 98 | 6.00% | $628,860 | $340.48 |
| 168 Beaver Trail | Sold | 1831 | 3 | 2.5 | Yes | 0.21 | 1980 | $735,000 | $401.42 | Mammoth Slopes IV | $725,000 | $395.96 | 6/26/2008 | 29 | 6.00% | $681,500 | $372.20 |
| 243 Tamarack | Sold | 1750 | 3 | 3 | Partial | 0.21 | 1989 | $739,000 | $422.29 | Mammoth Camp Tract II | $700,000 | $400.00 | 7/7/2008 | 130 | 5.00% | $665,000 | $380.00 |
| 1682 Forest Lane | Sold | 1431 | 3 | 2 | No | 0.20 | 1968 | $489,000 | $341.72 | Mammoth Slopes III | $435,000 | $297.00 | 8/3/2008 | 164 | 4.00% | $408,000 | $285.12 |
| 27 Johan | Sold | 2600 | 4 | 3.5 | Yes | 0.18 | 1991 | $1,045,000 | $401.92 | Mammoth Slopes IV | $1,000,000 | $384.62 | 8/28/2008 | 58 | 4.00% | $960,000 | $369.23 |
| | | | | | | | | Average | $324.55 | | Average | $308.60 | | | | Average | $284.64 |
| 243 Crystal Lane | Active | 2133 | 3 | 3 | No | 0.17 | 1978 | $699,000 | $327.71 | Mammoth Slopes III | | | | 150 | | | |
| 416 Alpine Circle | Active | 2600 | 5+ | 3 | Partial | 0.13 | 1963 | $699,000 | $268.85 | Mammoth Heights B | | | | 146 | | | |
| 115 Tamarack Street | Active | 2225 | 3 | 2.5 | No | 0.36 | 1990 | $699,900 | $314.56 | Mammoth Camp Tract I | | | | 57 | | | |
| 401 Hillside Drive | Active | 1920 | 3 | 2.5 | Partial | 0.18 | 1988 | $819,900 | $427.03 | Mammoth Slopes IV | | | | 58 | | | |
| 506 Lakeview Blvd. | Active | 1603 | 3 | 2 | No | 0.18 | 1972 | $650,000 | $405.49 | Mammoth Slopes IV | | | | 40 | | | |
| 118 Beaver Trail | Active | 2800 | 4 | 5+ | Yes | 0.20 | 1970 | $749,000 | $267.50 | Mammoth Slopes IV | | | | 162 | | | |
| 138 Aspen Lane | Active | 2299 | 4/Loft | 4 | Yes | 0.21 | 1976 | $624,500 | $271.64 | Mammoth Slopes IV | | | | 177 | | | |
| 250 Tamarack Lane | Active | 1991 | 3 | 2.5 | No | 0.17 | 1988 | $700,000 | $351.58 | Mammoth Camp Tract I | | | | 289 | | | |
| 115 Tamarack Street | Active | 2225 | 3 | 2.5 | No | 0.36 | 1990 | $675,000 | $303.37 | Mammoth Camp Tract I | | | | 76 | | | |
| | | | | | | | | Average | $326.41 | | | | | | | | |

Loan No: 090183338

## Mortgage Workout Plan

**Appraisal Dec, 2005 $1,010,000**

| | Original Debt | Negative Amortization | Current Debt | High Current Value of home | Mid Current Value of home | Low Current Value of home | Current Interest Rate | Current Monthly Payment | Equity |
|---|---|---|---|---|---|---|---|---|---|
| IndyMac | $191,300.00 | $0.00 | $202,274.15 | | | | | | |
| Countrywide | $668,000.00 | $84,960.20 | $752,960.20 | | | | 7.75% | $1,297.17 | -$326,759.35 |
| Total | $859,300.00 | | $955,234.35 | $664,544.00 | $628,475.00 | $592,406.00 | 4.2538% | $2,669.14 | -$124,485.20 |
| | | | | | % Drop -37.77% | | | $3,966.31 | |
| Price per Sq. Ft | | | | $304.00 | $287.50 | $271.00 | | | |

| | 1st TD | 95% of Mid Value | Restructured Debt | Loss to Creditors | | | New Interest Rate | New Monthly Payment | New Equity |
|---|---|---|---|---|---|---|---|---|---|
| Countrywide | | | $597,051.25 | $155,908.95 | | interest only | 3.2500% | $1,617.01 | $31,423.75 |

| | Annual | Monthly | DTI % of Income with Modified Mortgage | Difference saved per month | Percent of Income without Modified Mortgage | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Income in 2008 | $78,528.68 | $6,544.06 | | | | | | | |
| Property Taxes | $2,934.60 | $244.55 | | | | | | | |
| Insurance | $1,888.92 | $157.41 | | | | | | | |
| Sub Total | | $401.96 | 6.14% | | | | | | |
| 1st TD with Taxes and Insurance | $19,404.17 | $1,617.01 | 24.71% | $1,052.13 | 40.79% | | | | |
| | $4,823.52 | $401.96 | 30.85% | | 6.14% | | | | |
| Grand Total | $29,051.21 | $2,018.97 | 30.85% | $1,052.13 | 46.93% | | | | |

| Creditor | Restructured Debt | % Loan to Current Market Value | Equity based on Current MV ($628,475) | Interest Only Rate | New Monthly Payment | % of Monthly Income |
|---|---|---|---|---|---|---|
| Countrywide | $597,051.25 | 95% | $31,423.75 | 3.25% | $1,617.01 | 24.71% |
| Total | $597,051.25 | | | | $1,617.01 | 24.71% |

Facsimile Cover Sheet
8 pages including cover

Pursuant to my conversation with Arnetta ( at extension
7863) this morning at 11:00 a.m., please find attached a request,
with supporting documentation, to have my loan modified
according to the guidelines of your Home Retention Program.

Berenice de la Salle

## To: Countrywide;
## (800) 658 9346
### From: Berenice de la Salle
Countrywide Loan No: 090183338

Fax No: 760 924 0250
Cell Phone No: 760 937 5645
Office No: 760 924 0212

EXHIBIT 5

**Countrywide**
**HOME LOANS**

P.O. Box 10287
VAN NUYS, CA 91410-0000

Business Address:
450 American Street
Simi Valley, CA 93065-6285

Send Payments to:
P.O. Box 10219
Van Nuys, CA 91410-0219

January 20, 2009

Sent Certified Mail:
7113 8257 1473 0443 4781
Return Receipt Requested

Berenice DE LA Salle
PO BOX 9399
MAMMOTH LAKES, CA 93546-9399

Account No.: 90183338
Property Address:
1687 Forest Trail
Mammoth Lakes, CA 93546

## NOTICE OF INTENT TO ACCELERATE

Dear Berenice DE LA Salle:

Countrywide Home Loans Servicing LP (hereinafter "Countrywide") services the home loan described above on behalf of the holder of the promissory note (the "Noteholder"). The loan is in serious default because the required payments have not been made. The total amount now required to reinstate the loan as of the date of this letter is as follows:

| Monthly Charges: | 11/01/2008 | | $8,007.42 |
|---|---|---|---|
| Late Charges: | 11/01/2008 | | $266.92 |
| Other Charges: | Total Late Charges: | | $133.46 |
| | Uncollected Costs: | | $120.00 |
| | Partial Payment Balance: | | ($0.00) |
| | | **TOTAL DUE:** | **$8,527.80** |

You have the right to cure the default. To cure the default, on or before February 19, 2009, Countrywide must receive the amount of $8,527.80 plus any additional regular monthly payment or payments, late charges, fees and charges, which become due on or before February 19, 2009.

The default will not be considered cured unless Countrywide receives "good funds" in the amount $8,527.80 on or before February 19, 2009. If any check (or other payment) is returned to us for insufficient funds or for any other reason, "good funds" will not have been received and the default will not have been cured. No extension of time to cure will be granted due to a returned payment. Countrywide reserves the right to accept or reject a partial payment of the total amount due without waiving any of its rights herein or otherwise. For example, if less than the full amount that is due is sent to us, we can keep the payment and apply it to the debt but still proceed to foreclosure since the default would not have been cured.

If the default is not cured on or before February 19, 2009, the mortgage payments will be accelerated with the full amount remaining accelerated and becoming due and payable in full, and foreclosure proceedings will be initiated at that time. As such, the failure to cure the default may result in the foreclosure and sale of your property. If your property is foreclosed upon, the Noteholder may pursue a deficiency judgment against you to collect the balance of your loan, if permitted by law.

You may, if required by law or your loan documents, have the right to cure the default after the acceleration of the mortgage payments and prior to the foreclosure sale of your property if all amounts past due are paid within the time permitted by law. However, Countrywide and the Noteholder shall be entitled to collect all fees and costs incurred by Countrywide and the Noteholder in pursuing any of their remedies, including but not limited to reasonable attorney's fees, to the full extent permitted by law. Further, you may have the right to bring a court action to assert the non-existence of a default or any other defense you may have to acceleration and foreclosure.

Your loan is in default. Pursuant to your loan documents, Countrywide may, enter upon and conduct an inspection of your property. The purposes of such an inspection are to (i) observe the physical condition of your property, (ii) verify that the property is occupied and/or (iii) determine the identity of the occupant. If you do not cure the default prior to the inspection, other actions to protect the mortgagee's interest in the property (including, but not limited to, winterization, securing the property, and valuation services) may be taken. **The costs of the above-described inspections and property preservation efforts will be charged to your account as provided in your security instrument and as permitted by law.**

If you are unable to cure the default on or before February 19, 2009, Countrywide wants you to be aware of various options that may be available to you through Countrywide to prevent a foreclosure sale of your property. For example:

- Repayment Plan: It is possible that you may be eligible for some form of payment assistance through Countrywide. Our basic plan requires that Countrywide receive, up front, at least ½ of the amount necessary to bring the account

This communication is from a debt collector.

Please write your account number on all checks and correspondence.

We may charge you a fee for any payment returned or rejected by your financial institution, subject to applicable law.

Current and that the balance of the overdue amount be paid, along with the regular monthly payment, over a defined period of time. Other repayment plans also are available.

- **Loan Modification:** Or, it is possible that the regular monthly payments can be lowered through a modification of the loan by reducing the interest rate and then adding the delinquent payments to the current loan balance. This foreclosure alternative, however, is limited to certain loan types.

- **Sale of Your Property:** Or, if you are willing to sell your home in order to avoid foreclosure, it is possible that the sale of your home can be approved through Countrywide even if your home is worth less than what is owed on it.

- **Deed-in-Lieu:** Or, if your property is free from other liens or encumbrances, and if the default is due to a serious financial hardship which is beyond your control, you may be eligible to deed your property directly to the Noteholder and avoid the foreclosure sale.

If you are interested in discussing any of these foreclosure alternatives with Countrywide, you must contact us immediately. If you request assistance, Countrywide will need to evaluate whether that assistance will be extended to you. In the meantime, Countrywide will pursue all of its rights and remedies under the loan documents and as permitted by law, unless it agrees otherwise in writing. Failure to bring your loan current or to enter into a written agreement by February 19, 2009 as outlined above will result in the acceleration of your debt.

Additionally, the U.S. Department of Housing and Urban Development (HUD) funds free or very low cost housing counseling across the nation. Housing counselors can help you understand the law and your options. They can also help you to organize your finances and represent you in negotiations with your lender if you need this assistance. You may find a HUD-approved housing counselor near you by calling 1-800-569-4287. For the hearing impaired, HUD Counseling Agency (TDD) numbers are available at 1-800-877-8339.

Time is of the essence. Should you have any questions concerning this notice, please contact Loan Counseling Center immediately at 1-800-641-5302. Our office hours are between 8:15 AM and 5:15 PM (Central Time).

Sincerely,

Loan Counseling Center

EXHIBIT 6



# Countrywide®
**HOME LOANS**

*Mail Stop, SV-65*
*450 American Street*
*Simi Valley, CA 93065*
0007414-0007414 STMTS 001 1----- 688455

**Notice Date:**   January 27, 2009

**Account No.:** 90183338

**Property Address:**
1687 Forest Trail
Mammoth Lakes, CA 93546

Berenice DE LA Salle
Po Box 9399
Mammoth Lakes, CA 93546

---

### IMPORTANT MESSAGE ABOUT YOUR LOAN

We have received your correspondence requesting our assistance because of the hardship you are facing. Unfortunately, we must deny your request at this time for the following reason(s):

The modification request does not meet defined criteria per the investor on the loan. Please contact us at 1-800-669-0102 if you need additional information for priority assistance. For all other questions, please contact the number below.

---

### WHAT THIS MEANS

If your loan is in foreclosure, a scheduled foreclosure sale will be conducted by Countrywide unless Countrywide specifically agrees in writing to suspend or cancel the foreclosure sale, or unless your loan is fully reinstated or paid off in accordance with your loan documents and applicable law prior to the scheduled foreclosure sale. If your loan is delinquent, Countrywide will continue to report all delinquencies to the credit reporting agencies until your loan is brought fully current.

---

### WHAT YOU NEED TO DO

Please contact us at 1-(800) 669-6654 if you need additional information.

For information about Countrywide Home Loans, please visit us online at www.countrywide.com.

Countrywide is required by law to inform you that this communication is from a debt collector.

EXHIBIT 7

01 090109206

TS No.  09-0109206

**Property Address:**
1687 FOREST TRAIL
MAMMOTH LAKES,  CA  93546

July 27, 2009

## Debt Validation Notice

**RECONTRUST COMPANY, N.A., acting in its capacity as agent for the beneficiary, is required by law to advise you of the following:**

**RECONTRUST COMPANY, N.A. may be a debt collector attempting to collect a debt and any information it obtains will be used for that purpose.**

### PURSUANT TO 15 USC 1692(G):

(a.) As of the date of this letter, you owe $787,615.31. Because of interest, late charges, and other charges that may vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your check, in which event we will inform you before depositing the check for collection. For further information, write the undersigned or call (800) 281-8219.

(b.) The name of the Creditor to whom the debt is owed:  BAC Home Loans Servicing, LP

(c.) Unless you, within (30) days after the receipt of this letter, dispute the validity of the debt or any portion of the debt, RECONTRUST COMPANY, N.A. will assume the amount to be valid.

(d.) If you notify RECONTRUST COMPANY, N.A. in writing, to the address provided below within the thirty (30) day period, that you dispute the debt, or any portion of the debt, RECONTRUST COMPANY,  N.A. will obtain verification of the debt or a copy of a judgment against you and mail a copy of such verification or judgment to you.

(e.) If you so request in writing to RECONTRUST COMPANY, N.A.'s address provided below within the thirty (30) day period, RECONTRUST COMPANY, N.A. will provide you with the name and address of the original creditor, if it is different from the current creditor:

**RECONTRUST COMPANY**
**Attn: Debt Validation**
**2380 Performance Dr., TX2-985-07-03**
**Richardson, TX 75082**

*Form capayoffamt (11/08)*

The state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt
Collection Practices Act require that, except under unusual circumstances, collectors may
not contact you before 8 a.m. or after 9 p.m. They may not harass you by using threats of
violence or arrest or by using obscene language. Collectors may not use false or
misleading statements or call you at work if they know or have reason to know that you
may not receive personal calls at work. For the most part, collectors may not tell another
person, other than your attorney or spouse, about your debt. Collectors may contact
another person to confirm your location or enforce a judgment. For more information
about debt collection activities, you may contact the Federal Trade Commission at
1-877-FTC-HELP or www.ftc.gov.

If you believe that you may be entitled to the benefit of the Servicemember's Civil Relief
Act, it is recommended that you consult with your attorney.

IMPORTANT BANKRUPTCY NOTICE: IF YOU PREVIOUSLY HAVE RECEIVED
A DISCHARGE OF THE HOME LOAN DEBT, THIS IS NOT AN ATTEMPT TO
COLLECT THE DEBT FROM YOU PERSONALLY, BUT IS AN ACT TO ENFORCE
THE CREDITOR'S VALID LIEN RIGHTS AGAINST THE PROPERTY WHICH
SECURES THE DEBT.

Sincerely,

**RECONTRUST COMPANY, N.A.**
Team Leader

Please write your loan number on all checks and correspondence.

*Form capayoffamt (11/08)*

EXHIBIT 8

Doc # 2009003802
Page 1 of 3
Date: 7/29/2009 12:41P
Filed by: TITLE COURT SERVICE
Filed & Recorded in Official Records
of MONO COUNTY
LYNDA ROBERTS
CLERK-RECORDER
Fee: $14.88

RECORDING REQUESTED BY:

WHEN RECORDED MAIL TO:

RECONTRUST COMPANY
1800 Tapo Canyon Rd., CA6-914-01-94
SIMI VALLEY, CA 93063

Attn: Maricela Sandoval
TS No. 09-0109206
Title Order No. 4213365

_____

SPACE ABOVE THIS LINE FOR RECORDER'S USE

### NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

## IMPORTANT NOTICE

### IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,

and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded ( which date of recordation appears on this notice).

This amount is  $29,502.27, as of 07/27/2009 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations ( such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

[Page 1 of 2 ]                    *Form lstnod (03/03)*

TS No. 09-0109206

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
C/O BAC Home Loans Servicing, LP
400 COUNTRYWIDE WAY SV-35
SIMI VALLEY, CA  93065
ATTN: JOE MUNIZ

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.

Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.  Remember,

## YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN THAT: RECONTRUST COMPANY, N.A., is acting as an agent for the Beneficiary under a Deed of Trust dated 04/25/2005, executed by BERENICE DE LA SALLE, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY as Trustor, to secure certain obligations in favor of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. as beneficiary recorded 05/10/2005, as Instrument No. 2005003675 (or Book , Page ) of Official Records in the Office of the County Recorder of Mono County, California.

Said obligation including ONE NOTE FOR THE ORIGINAL sum of $ 668,000.00.

That a breach of , and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of : FAILURE TO PAY THE INSTALLMENT OF PRINCIPAL AND INTEREST  WHICH BECAME DUE ON  11/01/2008  AND ALL SUBSEQUENT INSTALLMENTS OF PRINCIPAL AND INTEREST, TOGETHER WITH ALL LATE CHARGES; PLUS ADVANCES MADE AND COSTS INCURRED BY THE BENEFICIARY INCLUDING FORECLOSURE FEES AND COSTS AND/OR ATTORNEYS' FEES.  IN ADDITION,  THE ENTIRE PRINCIPAL AMOUNT WILL BECOME DUE ON 05/01/2035 AS A RESULT OF THE MATURITY OF THE OBLIGATION ON THAT DATE.

That by reason thereof, the present beneficiary under such deed of trust has executed and delivered to RECONTRUST COMPANY, N.A. a written Declaration of Default and Demand for sale, and has deposited with RECONTRUST COMPANY, N.A. such deed of trust and all documents evidencing obligations secured  thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable  and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

If required by the provisions of Section 2923.5 of the California Civil Code, the declaration from the mortgagee, beneficiary or authorized agent is attached to the Notice of Default duly recorded with the appropriate County Recorder's office.

Dated: July 27, 2009
RECONTRUST COMPANY, N.A., as agent for the Beneficiary
By First American Title Insurance Company, as its Attorney in Fact

By _____

REO ALEXANDER

[Page 2 of 2 ]                                   Form lstnpd (03/03)



**Home Loans**

**Notice Date:** July 10, 2009
**Account No.:** TS #09-0109206

**Property Address:**
1887 Forest Trail
Mammoth Lakes, CA 93546

Berenice DE LA Salle
Po Box 9399
Mammoth Lakes, CA 93546

## CALIFORNIA DECLARATION

I, _Lorraine Drewry_ of BAC Home Loans Servicing, LP, declare under penalty of perjury, under the laws of the State of California, that the following is true and correct:

☒ BAC Home Loans Servicing, LP has contacted the borrower to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure,

☐ BAC Home Loans Servicing, LP tried with due diligence to contact the borrower in accordance with California Civil Code Section 2923.5, or

☐ BAC Home Loans Servicing, LP verified that the borrower has surrendered the property.

☐ BAC Home Loans Servicing, LP has evidence and reasonably believes that the borrower has contracted with an organization, person, or entity whose primary business is advising people who have decided to leave their homes on how to extend the foreclosure process and to avoid their contractual obligations to beneficiaries.

☐ BAC Home Loans Servicing, LP has confirmed that the borrower(s) filed for bankruptcy and the proceedings have not been finalized to wit, there is no order on the court's docket closing or dismissing the bankruptcy case.

☐ The    provisions    of    California    Civil    Code    §2923.5    do    not    apply    because

_____

7/13/09,    Ft. Worth, TX
Date and Place

_Collector II_
Title and/or Position

Name of Signor

State of California

This communication is from BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A.
CALDECLH 6652/9524 8/29/2008

The foregoing instrument is a full, true and correct copy
of an original record in my office as it appears in
OFFICIAL RECORDS, Inst.# 2009003802

Attest: Sep 17, 2009

County Recorder

County of Mono, State of California

By Debra Vande Beek _____ Deputy.

EXHIBIT 9

1687 Forest Trail
P.O. Box 9399
Mammoth Lakes, CA 93546

(760) 934 9584

SENT VIA CERTIFIED MAIL NO: 7006 3450 0001 3898 5823
WITH RETURN RECEIPT REQUESTED

August 11th, 2009

Recontrust Company
Attn: Debt Validation
2380 Performance Dr., TX2-985-07-03
Richardson, TX 75082

Re: TS No. 09-0109206

Dear Debt Collector:

This letter is sent in response to your letter dated July 27th, 2009 (copy attached), which I
received on August 4th, 2009.  Pursuant to my rights under federal debt collection laws, I am
requesting that you provide validation of this debt. This is not a refusal to pay, but a request
that your offices provide me with evidence that the debt, in the amount stipulated, is due.

  Please provide me with the following:
    What the money you say I owe is for;
    Explain and show me how you calculated what you say I owe;
    Provide me with copies of any papers that show I agreed to pay what you say I owe;
    Provide a verification or copy of any judgment if applicable;
    Identify the original creditor;
    Prove the Statute of Limitations has not expired on this account
    Show me that you are licensed to collect in my state
    Provide me with your license numbers and Registered Agent.

    You are hereby notified that if you do not comply with this request, I will file a
complaint with the Federal Trade Commission and the California Attorney General's office.

Sincerely,

Berenice de la Salle

Berenice de la Salle

Enc: Letter from Recontrust Company, dated July 27th, 2009

01 090109206

TS No. 09-0109206

**Property Address:**
1687 FOREST TRAIL
MAMMOTH LAKES, CA 93546

July 27, 2009

## Debt Validation Notice

**RECONTRUST COMPANY, N.A., acting in its capacity as agent for the beneficiary, is required by law to advise you of the following:**

**RECONTRUST COMPANY, N.A. may be a debt collector attempting to collect a debt and any information it obtains will be used for that purpose.**

### PURSUANT TO 15 USC 1692(G):

(a.) As of the date of this letter, you owe $787,615.31. Because of interest, late charges, and other charges that may vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your check, in which event we will inform you before depositing the check for collection. For further information, write the undersigned or call (800) 281-8219.

(b.) The name of the Creditor to whom the debt is owed:  BAC Home Loans Servicing, LP

(c.) Unless you, within (30) days after the receipt of this letter, dispute the validity of the debt or any portion of the debt, RECONTRUST COMPANY, N.A. will assume the amount to be valid.

(d.) If you notify RECONTRUST COMPANY, N.A. in writing, to the address provided below within the thirty (30) day period, that you dispute the debt, or any portion of the debt, RECONTRUST COMPANY, N.A. will obtain verification of the debt or a copy of a judgment against you and mail a copy of such verification or judgment to you.

(e.) If you so request in writing to RECONTRUST COMPANY, N.A.'s address provided below within the thirty (30) day period, RECONTRUST COMPANY, N.A. will provide you with the name and address of the original creditor, if it is different from the current creditor:

**RECONTRUST COMPANY**
**Attn: Debt Validation**
**2380 Performance Dr., TX2-985-07-03**
**Richardson, TX 75082**

EXHIBIT 10

 **ReconTrust**™

August 31, 2009

VIA FIRST CLASS MAIL

Berenice de la Salle
1687 Forest Trail
PO Box 9399
Mammoth Lakes, CA 93546

RE: Deed of Trust dated April 25, 2005
     Account No. 90183338

Dear Ms. De La Salle:

This letter will serve as a response to your request for verification of the indebtedness relative to the above identified account. The remaining issues raised in your letter will be addressed by BAC Home Loans Servicing, LP in a separate letter. The name and address of the original creditor of the underlying debt is America's Wholesale Lender, PO Box 10219, Van Nuys, CA 91410-0219. Please find enclosed a copy of the Subject Deed of Trust and the Note as well as the payment history for the above referenced account since it has been serviced by BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing, LP. We have been advised by the creditor or servicer that the payoff calculation for this account is as follows:

| | |
|---|---|
| Principal Balance as of 10/1/08 | $752,960.20 |
| Interest from 10/1/08 through 9/15/09 | 38,163.30 |
| County Recording Fee | 8.00 |
| Uncollected Late Charges | 667.30 |
| Fees Due | 135.00 |
| Additional Fees and Costs | 1,495.44 |
| Escrow Balance Due | 9,024.00 |
| Expedited Payoff Fee | 90.00 |
| Total Amount Due on the Account | $802,543.24 |

These figures are projected through 9/15/09 and are valid through that date. Please call 1-800-669-6607 before remitting funds as the figures listed above are subject to change without notice.

If you have any information or documentation indicating the payoff calculation is incorrect, please direct copies to the attention of the undersigned as soon as possible. In addition, if you would like to inquire about a loan modification or another type of workout assistance, we suggest you contact the Home Retention Team at (800) 669-6650 as soon as possible. Should you have any questions regarding the enclosed, please contact me at 972-498-2182.

Sincerely,

Wendy McKnight

Wendy McKnight
Vice President-ReconTrust Legal Support
Encls.

2380 Performance Drive, Building C, Mailstop: TX2-984-04-07, Richardson, TX 75082

Exhibit 11 (a)

# Securitization Flow Chart



Exhibit 11 (b)

Figure A -- Subprime Home Mortgage Securitization Structure



Exhibit 12 (a)

1687 Forest Trail
P.O. Box 9399
Mammoth Lakes, CA 93546

(760) 937 5645

September 25th, 2009

CERTIFIED MAIL WITH RETURN RECEIPT 7006 3450 0001 3900 8033

TransUnion Consumer Solutions
2 Baldwin Place
P.O. Box 2000
Chester, PA 19022-2000

> Re:   Berenice Thoreau de la Salle
>       SSN: 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
>       Address: Above
>       Phone: Above
>       DOB:   November 18, 1951
>       **Trans Union File Number:  211706186**
>       **INVESTIGATION REQUEST**

To whom it may concern:

Your records reflect that I owe $752,960   to BAC HOME LOANS SERV LP (#901833380), 450
AMERICAN ST SV, SIMI VALLEY , CA 93065. This is inaccurate information. Pursuant to the
Uniform Commercial Code, the creditor in question and its agents/principals do not have a
legitimate claim to be paid or to foreclose on this debt as they are not in possession of the
original promissory note nor the allonge or endorsements thereto. Therefore, the particular
"loan" your file reflects is invalid.

I am attaching a copy of a Complaint for Declaratory Relief, Injunctive Relief and
Damages filed in the United States District Court for the Eastern District of California at
Sacramento which gives in specific detail the reasons why this "loan" is a fraudulent claim.
Please remove ALL RECORD of this loan from my file.

Sincerely,

Berenice Thoreau de la Salle

Exhibit 12 (b)

1687 Forest Trail
P.O. Box 9399
Mammoth Lakes, CA 93546

(760) 937 5645

September 25th, 2009

CERTIFIED MAIL WITH RETURN RECEIPT 7006 3450 0001 3900 8057

Experian
PO Box 9600,
Allen, TX 75013.

> Re:  Berenice Thoreau de la Salle
> SSN: 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
> Address: Above
> Phone: Above
> DOB:  November 18, 1951
> **Experian Credit Report NO 4135234789**
> INVESTIGATION REQUEST

To whom it may concern:

Your records reflect that I owe $752,960   to BAC HOME LOANS SERV LP (#901833380), 450
AMERICAN ST SV, SIMI VALLEY , CA 93065. This is inaccurate information. Pursuant to the
Uniform Commercial Code, the creditor in question and its agents/principals do not have a
legitimate claim to be paid or to foreclose on this debt as they are not in possession of the
original promissory note nor the allonge or endorsements thereto. Therefore, the particular
"loan" your file reflects is invalid.

I am attaching a copy of a Complaint for Declaratory Relief, Injunctive Relief and
Damages filed in the United States District Court for the Eastern District of California at
Sacramento which gives in specific detail the reasons why this "loan" is a fraudulent claim.
Please remove ALL RECORD of this loan from my file.

Sincerely,

Berenice Thoreau de la Salle

Exhibit 12 (c)

1687 Forest Trail
P.O. Box 9399
Mammoth Lakes, CA 93546

(760) 937 5645

September 25th, 2009

CERTIFIED MAIL WITH RETURN RECEIPT 7006 3450 0001 3900 8040

Equifax Information Services, LLC
P.O. Box 740256
Atlanta, GA 30374

> Re:   Berenice Thoreau de la Salle
>        SSN: 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
>        Address: Above
>        Phone: Above
>        DOB:  November 18, 1951
>        **Equifax File Number:  9765732193**
>        <u>INVESTIGATION REQUEST</u>

To whom it may concern:

Your records reflect that I owe $752,960  to BAC HOME LOANS SERV LP (#901833380), 450 AMERICAN ST SV, SIMI VALLEY , CA 93065. This is inaccurate information. Pursuant to the Uniform Commercial Code, the creditor in question and its agents/principals do not have a legitimate claim to be paid or to foreclose on this debt as they are not in possession of the original promissory note nor the allonge or endorsements thereto. Therefore, the particular "loan" your file reflects is invalid.

I am attaching a copy of a Complaint for Declaratory Relief, Injunctive Relief and Damages filed in the United States District Court for the Eastern District of California at Sacramento which gives in specific detail the reasons why this "loan" is a fraudulent claim. Please remove ALL RECORD of this loan from my file.

Sincerely,


Berenice Thoreau de la Salle

Exhibit 13

P0WAEM00205094-I034457-001411900

BERENICE DELASALLE IV
9399 PO BOX 9399
MAMMOTH LAKES, CA 93546

Our investigation of the dispute you recently submitted is now complete. The results are listed below.

If our investigation has not resolved your dispute, you may add a 100-word statement to your report. If you provide a consumer statement that contains medical information related to service providers or medical procedures, then you expressly consent to TransUnion including this information in every credit report we issue about you.

If there has been a change to your credit history resulting from our investigation, or if you add a consumer statement, you may request that TransUnion send an updated report to those who received your report within the last two years for employment purposes, or within the last one year for any other purpose.

If interested, you may also request a description of how the investigation was conducted along with the business name, address and telephone number of any company we may have contacted for information.

Thank you for helping ensure the accuracy of your credit information.

## Investigation Results

| ITEM | DESCRIPTION | RESULTS |
|---|---|---|
| PERSONAL INFORMATION | | NEW INFORMATION BELOW |
| BAC HOME LOANS SERV LP | # 90183338 | NEW INFORMATION BELOW |

**Name:** BERENICE DELASALLE IV

**SSN:** XXX-XX
**Date of Birth:** 11/1951
**Telephone:** 934-9584
Your SSN is partially masked for your protection.

**Other Names:**
DELASALLE,BERENICE,THOREAU
DE,BERENICE
DELASALLEII,BERENICE
You have been on our files since 09/1970

## CURRENT ADDRESS

**Address:** 9399 PO BOX 9399
MAMMOTH LAKES, CA 93546
**Date Reported:** 01/2002

## PREVIOUS ADDRESS

**Address:** 805 PO BOX 805,
MAMMOTH LAKES, CA 93546
**Date Reported:** 12/2001

**Address:** 1687 FOREST TR
MAMMOTH LAKES, CA 93546

## EMPLOYMENT DATA REPORTED

**Employer Name:** CALDWELL BANKER
**Date Reported:** 10/2006

**Position:**
**Hired:**

**Employer Name:** INTERNATIONAL CONSUL
**Date Reported:** 11/2004

**Position:**
**Hired:**

The key to the right helps explain the payment history information contained in some of the accounts below. Not all accounts will contain payment history information, but some creditors report how you make payments each month in relation to your agreement with them.

| N/A | X | OK | | | | |
|-----|---|----|----|----|----|----|
| Not Applicable | Unknown | Current | 30 days late | 60 days late | 90 days late | 120 days late |

The following accounts contain information which some creditors may consider to be adverse. Adverse account information may generally be reported for 7 years from the date of the first delinquency, depending on your state of residence. The adverse information in these accounts has been printed in [brackets] or is shaded for your convenience, to help you understand your report. They are not bracketed or shaded this way for creditors. (Note: The account may be scrambled by the creditor for your protection.)

## BAC HOME LOANS SERV LP #90183338

450 AMERICAN ST SV416X
SIMI VALLEY, CA 93065
(800) 669-6607

**Balance:** $752,960
**Date Verified:** 10/2009
**High Balance:** $668,000
**Past Due:** >$27,292<
**Terms:** 360 MONTHLY $2669

**Pay Status:** >120 DAYS PAST DUE<
**Account Type:** MORTGAGE ACCOUNT
**Responsibility:** INDIVIDUAL ACCOUNT
**Date Open:** 04/2005

Loan Type: CONVENTIONAL REAL ESTATE MTG
Remarks: ACCT INFO DISPUTED BY CONSUMR
Estimated date that this item will be removed: 10/2015

| Late Payments (25 months): | X | | | OK | OK | | | | OK | | OK | OK | | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Past 24 months | sep | aug | jul | jun | may | apr | mar | feb | '09 | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | '08 | dec | nov | oct |

Exhibit 14 (a)

COPY

1687 Forest Trail
P.O. Box 9399
Mammoth Lakes, CA 93546

SELF CERTIFIED ON
AUGUST 13 2009
# 7001 1140 0000 2746 759.

SENT VIA CERTIFIED MAIL NO: 7006 3450 0001 3898 5854
WITH RETURN RECEIPT REQUESTED

August 11th, 2009

Bank of America
Attention: Home Loans
Customer Service Department, CA6-919-01-41
P.O. Box 5170
Simi Valley, CA 93062-5170

Re: Loan Number: 90183338
Name : Berenice de la Salle
Subject Address : 1687 Forest Trail, Mammoth Lakes, CA 93546

To Whom It May Concern:

Please accept this letter as a "Qualified Written Request" under Section 6 of the Real
Estate Settlement Procedures Act (RESPA) to obtain copies of ALL documents pertaining to
the origination of the above mentioned current mortgage on the referenced subject property.
Please see below for a list of documents needed.

☐ Initial Loan Application and Final Loan Application
☐ Executed Notice of Right to Cancel (if refinance)
☐ Deed of Trust/All Riders
☐ Note and All Addendums/Riders
☐ Truth-in Lending Statements
☐ Itemization of Amount Financed
☐ Good Faith Estimates
☐ Estimated and Final Closing Statements (HUD)
☐ Appraisal
☐ Title Report
☐ Grant Deed(s)
☐ Copy of Loan Payment History – This must include all payments made, all fees
incurred, any and all escrow account disbursements and how payments were applied

In addition to the above, please forward any and all disclosures, rate sheets etc. associated with the above transaction. Please note that all copies need to be clear and legible and all documents should be copied in their entirety.

In closing, I understand that under Section 6 of RESPA you are required to acknowledge my request within 20 business days and try to resolve any issues within 60 business days. Please forward requested documentation as soon as possible and I look forward to working with you on a solution that benefits our mutual concerns.

Thank you for your time.

Sincerely,

Berenice de la Salle

Berenice de la Salle

Exhibit 14 (b)

1687 Forest Trail
P.O. Box 9399
Mammoth Lakes, CA 93546

SENT VIA CERTIFIED MAIL NO: 7001 1140 0000 2766 7615
WITH RETURN RECEIPT REQUESTED

September 9th, 2009

Bank of America
Attention: Home Loans
Customer Service Department, CA6-919-01-41
P.O. Box 5170
Simi Valley, CA 93062-5170

Re: Loan Number: 90183338
Name : Berenice de la Salle
Subject Address : 1687 Forest Trail, Mammoth Lakes, CA 93546

To Whom It May Concern:

This letter follows my letter of August 11th, 2009, (copy attached) sent to you as a "Qualified Written Request" under Section 6 of the Real Estate Settlement Procedures Act (RESPA) to obtain copies of ALL documents pertaining to the origination of the above mentioned current mortgage on the referenced subject property.

Although, under Section 6 of RESPA, you are required to acknowledge my request within 20 business days and try to resolve any issues within 60 business days, to date I have not received a response from you concerning my demand.

I am in receipt of your Notice of Default, dated July 27th, 2009, a copy of which is attached.

This letter is a request that you provide me with the name and address of the CURRENT OWNER of the underlying note evidencing debt (the real party in interest) who is the only party with legal authority to foreclose.

Moreover, I hereby object to the Notice of Default and request that you send a copy of this letter to your insurance carrier, the title insurance carrier and all other interested parties as described herein for the following reasons:

1. There is no delinquency or default. The Lender has been paid in full plus a fee for standing in for an undisclosed third party lender that was not properly registered or regulated as a financial institution or lender at the time the transaction took place.

- **IN ADDITION I HEREBY EXERCISE MY RIGHTS TO RESCIND THE LOAN TRANSACTION IN ITS ENTIRETY UNDER THE THREE DAY RULE, THE THREE YEAR LIMITATION, AND UNDER THE USURY AND GENERAL CLAIMS THEORIES AND CAUSES OF ACTION. BY FAILING TO DISCLOSE THE TRUE LENDER AND USING SUBTERFUGE TO HIDE THE FACT THAT THE "LENDER" AT CLOSING WAS PAID TO POSE AS THE LENDER WHEN IN FACT AN UNDISCLOSED UNREGISTERED THIRD PARTY HAD RENTED THE CHARTER OR LENDING LICENSE OF THE "LENDER", THE LIMITATIONS ON MY RIGHT TO RESCIND WAS EXTENDED INDEFINITELY. UNDER STATE AND FEDERAL LAW, THE MORTGAGE IS NOW EXTINGUISHED AND YOUR RIGHTS UNDER THE TRUSTEE DEED HAVE TERMINATED.**

2. The Lender has failed to state the name or address of the holder in due course, John Does 1-1000, being the holders of certificates of asset backed securities, which are backed by the security instrument (mortgage) on the subject residential property.

3. The Lender does not own, possess or control the note or the mortgage, which has been satisfied in full. Demand is herewith made for satisfaction of mortgage to be filed in the appropriate county records.

4. The authority of your Trustee has also been transferred to the Trustee of the pooled mortgages and/or notes on various properties, real and personal, that were included in an asset pooled that was eventually securitized and sold to investors, who along with others in the chain of securitization acquired rights and obligations to the note, mortgage, and stream of revenue eventually due to the investor.

5. Because of the known presence of necessary and indispensable parties to any dispute that the true holders in due course might have against me, only a judicial proceeding in which all parties are included will provide a fair determination of the rights, obligation and title to the property, mortgage and note.

6. The "loan closing" was in fact a scheme to trick me into issuing a negotiable instrument that was pre-sold to investors as an unregulated security. The parties and

Bank of America
September 9th, 2009

their fees were not revealed nor was the true APR disclosed.

 7. The title agent, which might well be the same as the Trustee also has insurance for errors and omissions and the title insurance company that issued the policy will have total liability for this fraudulent transaction to the extent it had knowledge through its agents of the fraudulent scheme.

 The totality of the transaction violates numerous state and federal laws including usury, Truth in Lending, deceptive business practices, and administrative standards for the practice of professions.

 Therefore, please confirm the filing and recording of the satisfaction of mortgage, send the original note back to me (or tell me where it is), and confirm the retraction of the attempt to collect a debt which is incorrectly stated, improperly computed, improperly obtained, and fraudulently produced and transmitted.

 In addition, I hereby request that a complete copy of the policy of title insurance, obtained at the time the debt was incurred be sent to me at my above address.

THIS LETTER SHALL NOT BE CONSTRUED AS A WAIVER OR ELECTION OF REMEDIES.

 Sincerely,

 Berenice de la Salle

Exhibit 14 (c)

**Bank of America** 

**Home Loans**

400 Countrywide Way
Mailstop CA6-919-01-27
Simi Valley, CA  93065

September 11, 2009

Berenice de la Salle
P.O. Box 9399
Mammoth Lakes, CA 93546

Property Address: 1687 Forrest Trail, Mammoth Lakes, CA 93546
Loan Number:            149516865

Dear Ms. De la Salle:

We are in receipt of your correspondence dated August 11, 2009, which was received on August
13, 2009, by BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A. ("BAC
Home Loans"), f/k/a Countrywide Home Loans Servicing LP.

As you indicated to treat your correspondence as a Qualified Written Request under RESPA section 6(e),
we will comply in the time provided by the statute, which is as follows:
1.  A loan servicer must provide a written response acknowledging receipt of a borrower's Qualified
    Written Request within 20 days (excluding Saturdays, Sundays and legal holidays) of receiving the
    Qualified Written Request.
2.  Within 60 days (excluding legal holidays, Saturdays and Sundays) of receiving a Qualified Written
    Request, the servicer must resolve the complaint by correcting the account or giving a written
    statement of the reasons for its position.

If you have any questions, please contact:          Paula Ryan-Apuzzo
                                                    Phone number 805 520-5330

Sincerely,

*Elsie Eisenberg*

Elsie Eisenberg
Litigation Specialist
Risk Management / BRLM



Exhibit 14 (d)

*1687 Forest Trail*
*P.O. Box 9399*
*Mammoth Lakes, CA 93546*

*(760) 937 5645*

Certified Mail with Return Receipt Requested: <u>7006 3450 0001 3900 8132</u>

October 8th, 2009

Bank of America Home Loans
Attention: Elsie Eisenberg; Paula Ryan-Apuzzo
Litigation Specialists
400 Countrywide Way
Mailstop CA6-919-01-27
Simi Valley, CA 93065

Re: <u>Loan Number: 90183338</u>
Third FDCPA Debt Verification Request and Third QWR.

Dear Mses. Eisenberg and Ryan-Apuzzo,

     I am in receipt of your form notice dated September 11th, 2009. To date, I have not received an answer to (i) my "Qualified Written Request" under the Real Estate Settlement Procedures Act, codified as Section 2605 (e) of Title 12 of the United States Code, addressed to you on August 11th, 2009, and (ii) my follow up letter addressed to you on September 9th, 2009 (see attached copies of both letters).

     Nor have I received a response to my letter of September 9th addressed to the Vice President of Legal Support for ReconTrust Company, N.A., a wholly owned subsidiary of Bank of America (a copy of said letter is also enclosed).

     This letter is to inform you that I intend to exercise my rights of rescission concerning the above referenced loan and that in order to do so it is imperative that the name of the true creditor for my loan be disclosed to me. As you know, under applicable law, that creditor is not the servicer nor the trustee under the Deed of Trust. The actual and true creditor is instead <u>the person(s) or entity(ies) who actually own and possess the original Promissory Note bearing my signature in ink, and the identity of said creditor, contrary to law, has never been disclosed to me.</u> Therefore, the tolling on the statute of limitations on my right of rescission has never begun and this letter is a formal demand that you immediately provide me with the name and address of said actual and true creditor.

Due to the recent mortgage market meltdown and your involvement in this market, I am concerned that my loan has not been properly credited, amortized, calculated, serviced and accounted for. As stated above, I am particularly concerned with the ownership of my promissory note; to whom my actual obligation is owed; who my actual lender is at this time; and, most importantly, if you possess the actual authority to collect payments of my promissory note from my actual lender.

The promissory note in question is a contract between myself and whoever owns that contract now. As such, I have the absolute legal right to the proof that it still exists and to full and immediate disclosure of all documents, including copies of all pertinent information, related to my loan. Therefore, this letter is also a demand that the original promissory note signed by me in ink, as it exists today along with all endorsements, affixed or un-affixed allonges, and assignments, whether recorded or not, be produced for my inspection.

In addition to the above demand please send to me, at the address above, copies of the following documents and answers to my servicing related questions below:

### DOCUMENTS DEMANDED

- All "master" transaction registers/ledgers of my loan in your servicing files or backup files with you or any sub-servicer, including but not limited to the Fidelity mortgage servicing system, FiServ, or any mortgage servicing system you use. Please provide and include:

  - all descriptions and legends of all codes used in your mortgage servicing and accounting system so that the examiners and experts I intend to retain to review my mortgage account may properly conduct their work.
  - all information residing in any data field in the system or any component that supports the system that deals with any of the questions listed below (no screen or partial dumps or spreadsheets please).

- A certified copy of the front and back portion of my mortgage as it exists today along with all assignments whether recorded or not.
- Cancelled checks, wire transmittals or other evidence of payment for each assignment of my promissory note.
- All executed, recorded and "non-recordable" assignments associated with my loan including, but not limited to assignments, transfers, allonges, or other documents evidencing a transfer, sale or assignment of my mortgage, deed of trust, promissory note or other document that secures payment by me to my obligation in this account from the inception of my loan to the present date.
- All records, electronic or otherwise, of assignments of my mortgage, promissory note, or servicing rights to my mortgage.

• All escrow analyses conducted on my account from the inception of my loan until the date of this letter.

### SERVICING RELATED QUESTIONS I NEED ANSWERED

I am concerned that good and proper title to my property no longer exists and that the amounts you claim are owed by me are incorrect. Please answer the following questions:

1. What is your actual servicing relationship with my loan? Are you the servicer, master servicer, interim servicer, private label servicer, default servicer, sub-servicer, and/or special servicer of my loan?

2. Has my promissory note ever been securitized? If so inform me of the following information:

> a. the names of all trusts, SPVs, QSPEs, REMICS, MBSs and entities that my note has been assigned to from its inception to the current date;
>
> b. The name of the current trust, SPV, QSPE, SPE, REMIC, MBS or entity my note is owned by;
>
> c. The CIK file number at the Securities and Exchange Commission that corresponds to the Prospectus [form 424 (b) 5] of the current trust, SPV, QSPE, SPE, REMIC, MBS or entity my note is owned by.

3. Is there any Fannie Mae, Freddie Mac, Ginnie Mae, FHA, HUD, USDA, VA, or private guarantee related to my loan?

> a. If yes, who has provided this guarantee and what portion of my payment goes to this guarantee?

4. Who is the document custodian (not the Trustee, the actual custodian) that safeguards and holds my "original" promissory note that I signed in ink?

5. Does my original promissory note currently have any "blank endorsements" on it? (Yes or No)

> a. If yes, can you kindly explain why?
>
> b. If yes, can you kindly tell me as of the date written above:
>
> > i. Who owns my note and is the actual current "lender" of my note? (not the "servicer", the actual lender)
> >
> > ii. Who claims to be the holder of my note?

6. Does my original promissory note properly reflect the chain of title from one interest to another? (Yes or No)

7. Are there any missing assignments? (Yes or No)

> a. If yes, can you kindly explain why?

8. Have any due diligence and/or quality control services conducted by you or any other entity on my loan identified any red flags, frauds, misrepresentations, misstatements, errors, or problems?

> a. If yes, detail them for me.

9. Has my loan ever been classified as a "scratch and dent" loan?

Bank of America
October 7th, 2009

a. If yes, detail this for me.

10. Will I receive my original (signed in ink) promissory note stamped "Cancelled & Paid In Full" when it is paid off or refinanced?

a. If no, tell me why not.

11. Have any BPOs, property inspections, and/or appraisals by you or any investor been conducted on my property since the inception of my loan? (Yes or No)

a. If yes, have I been charged or assessed any fee for any BPOs, property inspections or appraisals after the inception of my loan (Yes or No)

i. If yes, kindly tell me the date(s) of such BPO, property inspections or appraisal, the amount paid and provide me with copies of all documents related to each BPO, property inspection or appraisal conducted on my property including, but not limited to reports, orders, invoices and cancelled checks for payments.

12. Who may I contact to negotiate the purchase and/or repurchase of my promissory note? ( I am not asking for the servicer of my loan, but the actual party who has the power to negotiate on the promissory note I signed.)

13. What is the name and date of the pooling and servicing agreement that governs your servicing of my loan?

a. Where can I secure a copy of this agreement?

b. If this document is available through the Securities and Exchange Commission, what is the CIK filing number that corresponds to this document?

14. Is there any power of attorney ("POA") filed in my property's county or any other county that governs your relationship with my loan?

a. If yes, identify for me the county where the POA is filed and the filing number, name, and date of the POA?

## SUSPENSE/UNAPPLIED ACCOUNT QUESTIONS

For purposes of this section, please treat the term "suspense account" and "unapplied account" as one in the same.

1. Have there been any suspense or unapplied account transactions on my account from the inception of my loan until the present date?

a. If yes, why? If no, please state same and skip the questions in this section dealing with suspense and unapplied accounts.

b. In a spreadsheet or in letter form in a columnar format, please detail for me each and every suspense or unapplied transaction, both debits and credits that has occurred on my account from the inception of my loan until present date?

c. What is my current suspense account balance?

d. Why was my money placed into suspense and how will it be allocated to my loan?

### LATE FEE QUESTIONS

For purposes of my questions below dealing with late fees, please consider the terms "late fees" and "late charges" to be one in the same.

1. Have there been any late fee transactions on my account from the inception of my loan until the present date?

> a. If yes, why? If no, please skip the questions in this section dealing with late fees.
>
> b. In a spreadsheet or in letter form in a columnar format, please detail for me each and every late fee transaction, both debits and credits that have occurred on my account from the inception of my loan until the present date.
>
> c. What is my current late fee balance?

2. Have you reported the collection of late fees on my account as interest in any statement to me or to the IRS? Yes or No?

3. Do you consider the payment of late fees as liquidated damages to you for not receiving my payment on time? Yes or No?

4. Are late fees considered interest? Yes or No?

5. Please detail for me in writing what expenses and damages you incurred for any payment I made that was late.

6. Were any of these expenses or damages charged or assessed to my account in any other way? Yes or No?

7. If yes, please describe what expenses or charges were charged or assessed to my account.

8. Please describe for me in writing what expenses you or others undertook due to any payment I made that was late.

9. Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, deed of trust, or any agreement I signed that authorized the assessment or collection of late fees.

Thank you in advance for addressing the questions and issues above. Upon receipt of the documents and answers, an exam and audit will be conducted that may lead to further document requests and answers to questions under an additional QWR letter.

Sincerely,


Berenice de la Salle

Exhibit 14 (e)

direct dial number:
(215) 575-7245

**Dilworth**
**Paxson**ₗₗₚ

Philip A. Italiano
pitaliano@dilworthlaw.com

November 9, 2009

Berenice De La Salle
PO Box 9399
Mammoth Lakes, CA 93546

Re:    Borrower(s): Berenice de la Salle (the "Borrower")
        Property Address: 1687 Forest Trail, Mammoth Lakes, CA 93546
        Loan Number(s): 90183338 (the "Loan")

Dear Ms. De La Salle:

This firm represents BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A. ("BAC Home Loans"), f/k/a Countrywide Home Loans Servicing LP, with regard to the Loan. We are writing in response to your correspondence dated August 11, 2009, September 9, 2009, and October 8, 2009 (collectively, the "Letter"), which were sent to BAC Home Loans for response, wherein you request information regarding the Loan. With respect to your request for rescission, BAC Home Loans will respond to that request under separate cover.

Although the Letter is couched as a "qualified written request," the information requested in the Letter goes well beyond that which is available through a qualified written request made under 12 U.S.C. §2605 ("QWR"). As you may be aware, a QWR is a written correspondence which includes a statement of specific reasons why the borrower believes that its account is in error and which provides sufficient detail to allow the servicer of the loan to review the borrower's account to determine whether there were errors made in connection with the account, and to either make appropriate corrections where errors were made or explain to the borrower why the servicer believes the account is accurate. A QWR is not a vehicle for a borrower to obtain confidential information concerning the lender's business practices, trade secrets or other proprietary information, nor can it be used to support a fishing expedition for documents that may support a claim or as a mechanism for seeking any other information which does not relate specifically to the borrower's loan. The Letter seeks information which goes well beyond that which is available through a QWR, while failing to provide any of the necessary detail regarding any specific error(s) made by the servicer in connection with the Loan.

Although the Letter is not in conformity with 12 U.S.C. §2605, BAC Home Loans reviewed its file documents in an attempt to obtain information responsive to those of your inquiries which were consistent with the requirements of 12 U.S.C. §2605. BAC Home Loans responds to the requests in your August 11, 2009 correspondence as follows:

Enclosed are copies of the following documents available under 12 U.S.C. §2605:

a)   Deed of Trust;
b)   Adjustable Rate Rider;
c)   Truth in Lending Disclosure Statements;
d)   Good Faith Estimates;
e)   Uniform Residential Loan Application;
f)   Adjustable Rate Note;
g)   Prepayment Penalty Addendum;
h)   Notice of Right to Cancel;
i)   Appraisal Report; and
j)   HUD-1 Settlement Statement.

Also enclosed is a Payment History, which provides a detailed outline of transactions for this Loan during BAC Home Loans' servicing. The Payment History provides pertinent information on payments received, tax and insurance payments disbursed, funds in the suspense/unapplied funds balance, and late charges assessed and paid. The Payment History is designed to be user-friendly and there are no codes or terms used in the Payment History that require specific definitions. The fees that have been charged against the account and are not reflected in the Payment History are as follows: expedited payoff service fees, $90.00; attorney fees, $325.00; property inspection fees, $179.00; title fees, $989.00; mailing fees, $29.44; recording fees, $14.00; mortgage pay by web and by phone service fees, $183.00.

Your remaining requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

BAC Home Loans responds to the inquiries in your September 9, 2009 correspondence as follows:

The current owner of the Note is U.S. Bank National Association as Trustee for SARM 05-19XS, with an address of 2530 South Parker Road 601, Aurora, CO 80014. BAC Home Loans has serviced the Loan since May 5, 2005.

BAC Home Loans expressly disputes your assertion that the Loan has been paid in full. Please refer to the enclosed Payment History for information relating to payments to date and the outstanding principal balance on the Loan. The Loan is currently due for the November 1, 2008 installment.

BAC Home Loans will respond to your rescission claim under separate cover, if it has not already done so.

BAC Home Loans responds to the inquiries in your October 8, 2009 correspondence as follows:

**1) Document Copies**
See the above list of the enclosed documents, which are available under 12 U.S.C. §2605. Your remaining requests are overly broad, do not concern the application of payments or the

disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**2) Servicing Related Questions**
As stated above, the current owner of the Note is U.S. Bank National Association as Trustee for SARM 05-19XS, with an address of 2530 South Parker Road 601, Aurora, CO 80014. BAC Home Loans has serviced the Loan since May 5, 2005.

A lender secured insurance policy was purchased on September 11, 2006, effective July 5, 2006, for a premium of $3,508.00. This policy was subsequently canceled and a full refund was posted to escrow on October 10, 2006.

Your remaining requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**3) Suspense/Unapplied Accounts**
See the enclosed Payment History. Your additional requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**4) Late Fees**
Late charges are reported as interest paid effective with the 2008 tax year. Prior to the 2008 tax year, there was no interest paid or reported to the IRS relating to late charges assessed and paid to this account. See the response to paragraph 2 above and the enclosed Payment History. Your remaining requests are overly broad, do not concern the application of payments or the disbursement of funds to the Borrower, and make no allegations whatsoever of any wrongdoing by BAC Home Loans. Accordingly, these requests are declined as they seek documentation that goes beyond that which is available through a "qualified written request" under 12 U.S.C. §2605.

**Request for Verification of Debt**

To the extent the Letter can be construed as a request for verification of the debt, please be advised that the Loan is evidenced by an Adjustable Rate Note (the "Note") dated April 25, 2005, in the principal amount of $668,000.00, executed by the Borrower, in favor of America's Wholesale Lender, a copy of which is enclosed. The Note was secured by a Deed of Trust dated the same date, a copy of which is also enclosed. Please refer to the enclosed documents for additional information. See above for information regarding the current owner of the note.

A payoff demand statement has been requested and will be forwarded to you under separate cover. This payoff demand statement will show all amounts necessary to pay off the Loan.

With respect to your originations concerns, your allegations of misrepresentation and/or fraud are vague and ambiguous. Accordingly, BAC Home Loans is unable to research these allegations until further clarification is provided regarding the nature of these alleged violations. Please be advised it is BAC Home Loans' position that the Borrower's signatures on the enclosed documents, and all other Loan documents executed in connection therewith, confirm that the Borrower received, read, understood, and agreed to the terms and conditions contained within each document. Based upon the foregoing, BAC Home Loans has found no evidence of loan origination fraud or predatory lending violations.

If you have further concerns or questions regarding this matter please contact BAC Home Loans' FREM Customer Escalation Team at (866) 200-9624. Thank you for this opportunity to be of service.

In providing the above response, BAC Home Loans is not limiting or waiving any rights or remedies it may now or hereafter have, whether arising under your Loan documents, at law or in equity, all of which rights and remedies are expressly reserved.

Very truly yours,

Philip A. Italiano

Enclosures

833147_1

# CERTIFICATE OF SERVICE

I am employed in the City of Mammoth Lakes and County of Mono, California, State of California. I am over the age of 18 and not a party to the within action. My business address is: Mammoth Business Essentials, 1934 Meridian Blvd. Mammoth Lakes, CA 93546.

On November 17, 2009, I caused to be served on the interested parties in said action the within **FIRST AMENDED COMPLAINT** by placing a true and correct copy thereof in a sealed envelope with postage fully prepaid and addressed as follows:

Bahareh Mostajelean
BRYAN CAVE LLP
Two Embarcadero Center, Suite 1410
201 Clay Street
San Francisco, CA 94111-3907

and by placing same in a U.S. Postal Service Mail drop box.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 17, 2009 in Mammoth Lakes, California.

Jessica Copeland-Anderson